151 F.Supp.2d 371 (2001)
In re LIVENT, INC. NOTEHOLDERS SECURITIES LITIGATION.
This document relates to all actions.
Alice F. Rieger, acting by and through her attorney-in-fact Robert L. Walters, Tri-Links Investment Trust, and Cerberus Capital Management, L.P., individually and on behalf of all others similarly situated, Plaintiffs,
v.
Garth Drabinsky, Myron I. Gottlieb, Gordon Eckstein, Robert Topol, Conrad M. Black, Joseph Rotman, Scott M. Sperling, H. Garfield Emerson, Martin Goldfarb, A. Alfred Taubman, Estate of Andrew Sarlos, Thomas H. Lee, James Pattison, Lynx Ventures, L.P., Lynx Ventures, L.L.C., Michael S. Ovitz, Ronald W. Burkle, Robert M.D. Cross, Quincy Jones, Heather Munroe-Blum, Jerry I. Speyer, Furman Selz, Inc., Roy Furman, Paine Webber, Inc., Deloitte & Touche, L.L.P., Deloitte & Touche Chartered *372 Accountants, Canadian Imperial Bank of Commerce, CIBC World Markets, CIBC Capital Partners, CIBC Wood Gundy Securities, Inc., CIBC Wood Gundy Capital, and CIBC Oppenheimer Securities Corp., Defendants.
Nos. 98 CIV. 7161(VM), 99 CIV. 9425(VM).
United States District Court, S.D. New York.
June 29, 2001.
*373 *374 *375 *376 *377 *378 *379 *380 Stanley M. Grossman, Patrick V. Dahlstrom, Pomerantz, Haudek, Block, Grossman & Gross, LLP, New York City, Lionel Z. Glancy, Peter A. Binkow, Los Angeles, CA, Donald R. Wager, Los Angeles, CA, for Plaintiffs.
Harvey L. Pitt, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Garth H. Drabinsky.
Lee S. Richard, Richards, Spears, Kibbe & Orbe, New York City, for Myron I. Gottlieb.
James S. Dittmar, Sanford F. Remz, Hutchins, Wheeler & Dittmar, Boston, MA, for Joseph L. Rotman.
D. Brian Hufford, Pomerant, Haudek, Block, Grossman & Gross, LLP, New York City, for Gordon Eckstein, H. Garfield Emerson, A. Alfred Taubman, and CIBC Oppenheimer.
D. Brian Hufford, Pomerant, Haudek, Block, Grossman & Gross, LLP, New York City, Cynthia A. Geigin, W. Sidney Davis, Hogan & Hartson, L.L.P., New York City, for Robert Topal.
Jonathon Rosenberg, O'Sullivan, L.L.P., New York City, for Martin Goldfarb.

DECISION AND ORDER
MARRERO, District Judge.

 Page
 TABLE OF CONTENTS
 I. INTRODUCTION 383
 II. THE PARTIES 385
A. PLAINTIFFS ...........................................................................385
B. DEFENDANTS ...........................................................................385
 1. Inside Directors/Management Defendants ...........................................385
 2. Outside Directors ................................................................386
 3. Securities Sellers ...............................................................387
 4. Auditors .........................................................................388
 5. Nominal Defendants ...............................................................388

*381
 6. Additional Rieger Action Defendants...............................................388
 III. LIVENT'S BACKGROUND AND DEMISE 389
A. PUBLIC FINANCINGS AND LOSSES .........................................................389
B. LIVENT'S FRAUD UNCOVERED .............................................................390
C. LIVENT'S BANKRUPTCY ..................................................................391
D. THE INSTANT ACTIONS ..................................................................392
 1. The Noteholders' Action ..........................................................392
 2. The Rieger Action ................................................................392
 IV. THE ALLEGED FRAUD 393
A. FRAUDULENT "REVENUE-GENERATING" TRANSACTIONS .........................................393
 1. Pace Theatrical Group ............................................................393
 2. American Artists .................................................................393
 3. CIBC Wood Gundy ..................................................................393
 4. Dundee Realty Corporation ........................................................395
 5. Pantages Theatre Naming Rights ...................................................396
 6. Dewlim Investments Limited .......................................................397
B. FRAUDULENT MANIPULATION OF LIVENT'S BOOKS AND RECORDS ................................398
C. THE UNDISCLOSED KICKBACKS ............................................................401
D. OTHER FRAUDULENT CONDUCT .............................................................401
 1. Livent's Fraudulent Ticket Purchases .............................................401
 2. Allegations Specific to Deloitte .................................................402
 V. DISCUSSION 403
A. LEGAL STANDARDS: MOTION TO DISMISS UNDER FED. R. CIV. P.
 12(B)(6) ............................................................................404
B. THE SECURITIES LAWS ..................................................................407
 1. The 1933 Securities Act ..........................................................408
 a. Section 11 ...................................................................408
 b. Section 12(a)(2) .............................................................409
 c. Section 15 ...................................................................409
 2. The Securities Exchange Act ......................................................409

*382
 a. Section 10(b) and SEC rule 10b-5 .............................................409
 b. Section 20(a) ................................................................413
 3. The 1995 Reform Act ..............................................................418
 a. Pleading Standards ...........................................................418
 b. Policy and Procedural Objectives .............................................422
 VI. APPLICATION OF THE SECURITIES STATUTES TO PLAINTIFFS'
 CLAIMS 426
A. THE NOTEHOLDERS' ACTION ..............................................................426
 1. Deloitte's Motion: Section 10(b) .................................................426
 a. The Revenue-Generating Transactions ..........................................426
 (i) The Dundee Transaction ...................................................427
 (ii) CIBC Wood Gundy Transaction ..............................................428
 b. Livent's Manipulation of Its Books and Records ................................428
 2. Deloitte's Motion: Section 11 Liability and Rule 9(b) Pleading Requirement .......429
 3. PaineWebber, Furman Selz, and CIBC Motion: Section 11 Claim ......................430
 4. PaineWebber/Furman Selz Motion: Section 12 Claim .................................432
 5. CIBC Wood Gundy and CIBC Oppenheimer's Motion: Section 10(b)
 Claims ..........................................................................432
 6. CIBC Motion: Section 12(a)(2) Claim ..............................................433
 7. Outside Directors Motion to Dismiss: Section 10(b) Claim .........................433
 8. Outside Directors' Motion: Section 11 Claims .....................................434
 a. Rule 9(b) ....................................................................434
 b. Standing ......................................................................434
 9. Outside Directors' Motion: §§ 12 and 15 Claims .........................436
 10. Outside Directors' Motion: § 20(a) Claims ...................................436
B. THE RIEGER ACTION ....................................................................437
 1. Status of Plaintiff Rieger .......................................................438
 2. Motion to Dismiss: § 10(b) Claims ...........................................438
 a. Reliance .....................................................................438
 b. Forward Looking Statements and Safe Harbor Analysis ..........................440

*383
 3. Motion to Dismiss: Claims Under Section 11 and 12(a)(2) ..........................441
 4. Motion to Dismiss: Claims, Under Sections 15 and 20(a) ...........................441
 a. State Claims and the Securities Litigation Uniform Standards Acts .............442
 b. Motion to Strike the Answer of Drabinsky, Ekstein, and Gottlieb and
 for Judgment on the Pleadings ................................................443
 VII. ORDER 445
A. THE NOTEHOLDERS' ACTION, 98 CIV. 7161 ................................................445
B. THE RIEGER ACTION, 99 CIV. 9425 ......................................................445

Livent, Inc. ("Livent") was once a well-known and seemingly successful producer of live theater on Broadway and around the world. Its credits include critically acclaimed musicals such as "Show Boat," "Fosse," "Phantom of the Opera," and "Ragtime." In November 1998, however, amid revelations of accounting fraud implicating its highest officers, Livent restated financial results for 1996, 1997, and the first quarter of 1998 by nearly $100 million. At the same time, the company declared bankruptcy in the United States and Canada.
The litigation spawned by Livent's demise includes two competing noteholders class actions now before this Court.[1] The first, In re Livent, Inc. Noteholders Sec. Litig., No. 98 Civ. 7191 (the "Noteholders' Action"), was brought on behalf of noteholders who purchased Livent 9 3/8 % Senior Notes Due 2004 (the "Notes") from October 10, 1997 through August 10, 1998 (the "Class Period"). Rieger v. Drabinsky, No. 98 Civ. 9425 (the "Rieger Action"), was later brought on behalf of noteholders who purchased Notes "anytime after October 10, 1997." Each charges various Livent officers, directors, auditors, and bankers with violations of: §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act" or the "1933 Act"), 15 U.S.C. §§ 77k, 77l(a)(2); §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act" or the "1934 Act"), 15 U.S.C. §§ 78j(b) and 78t; and S.E.C. Rule 10b-5, 17 C.F.R. § 240.10b-5. The actions gave rise to a series of motions brought pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b), as well as under the Private Securities Litigation Reform Act of 1995 (the "PSLRA" or "1995 Reform Act"), Pub.L. No. 104-67, 109 Stat. 737 (1995) (codified at 15 U.S.C. §§ 77z-1-77z-2, 78u-4-78u-5). The motions assert that the complaints in both suits fail to state a claim upon which relief may be granted and to plead fraud with sufficient particularity.

I. INTRODUCTION

Einstein's most celebrated theory not only altered our understanding of the physics of time and space, but added meaningfully to the language and to our conceptualization of social phenomena and principles. The popular maxim that "everything is relative" illustrates the point. And the controversy now before the Court is a case study, among other things, of the relativism[2] the adage conveys, reflecting *384 that much of the law, as is generally true of many other aspects of life, is built upon finely parsed matters of degree each dependent upon interrelated variables. Notions of right and wrong, participation and state of mind, culpability and corresponding penalties are all common legal concepts grounded on gradations of social behavior. These calibrations determine how far from the epicenter of a harmful event its shock waves and ripples may travel to fairly encompass within the rings of culpability and relief both the actions claimed to have set the effects in motion as well as the range of injuries suffered by victims in the aftermath.
Plaintiffs in the related Livent actions comprise different classes of interests which vary by (1) the time of their securities purchases: before and after public disclosure of Livent's disintegration; (2) the type of equity they held: stocks and notes differently dated; and (3) the theory of liability they claim: federal securities fraud under § 10(b) and "control person" liability under § 20(a) of the Exchange Act or misrepresentation under §§ 11 and 12 of the Securities Act.
Defendants encompass individuals and institutions whose involvement in the underlying events ranges across a spectrum of conduct. Arranged concentrically by corporate structure, at the center are Livent's chief management executives who masterminded the alleged wrongs, along with their inside accomplices, some willing and actively engaged, while others remained passive. Next in the hierarchy are the members of Livent's Audit Committee, followed by other outside directors, divided in time by old and new Livent regimes in recognition of their varying roles in different episodes as Livent's drama progressed. In the ring beyond are the company's external auditors, securities sellers and financial advisors who rendered financial services in connection with the securities transactions here in question.
From some Plaintiffs' perspective, the involvement and liability of these actors in the losses Plaintiffs claim are practically undifferentiated. All stand accused of occupying the same culpable inner circle, and of having played substantial roles as knowing or reckless or as only careless participants whose conduct regarding the transactions at issue directly or indirectly caused Plaintiffs' alleged injuries.
In the Court's construction of the pleadings and of the parties' submissions in favor of and against defendants' multiple motions to dismiss the complaints, resolution of each dispute lies at a critical point on a continuum. That juncture occurs where the quantum of defendants' knowledge of and sufficient involvement in the relevant transactions would support Plaintiffs' theory of liability, or, conversely, where the extent of relevant matters objectively known to Plaintiffs at the time they purchased Livent securities would undermine their theory of recovery.
For the reasons indicated, the Court concludes that some Plaintiffs in these actions plead facts sufficiently demonstrating that they cross the threshold entitling them to relief while others do not. Similarly, a fair reading of the pleadings demonstrates that the roles and states of mind of defendants vary. As to some, Plaintiffs assert facts that, if proven true, would be sufficient to constitute fraud or recklessness. As to other defendants, while the extent of scienter Plaintiffs allege may be *385 inadequate to warrant a finding of extreme conduct satisfying the elements of fraud under § 10(b) of the Exchange Act, their participation in the events suffices to make out a case of misrepresentation under the Securities Act. Relative to yet another defendant group, the pleadings do not support any determination that the accusations fall within the bands of culpable conduct at all. Accordingly, defendants' motions are granted in part and denied in part.

II. THE PARTIES

A. PLAINTIFFS

Plaintiffs here are all purchasers of the Notes. The lead plaintiffs in the Noteholders' Action, Dorian and Diane King (the "Kings"), purchased Livent Notes at the face amount of $100,000 for $102,750 during the Class Period. See Noteholders' Action Second Amended Consolidated Class Action Complaint ("NH SAC") ¶ 12. Plaintiffs to the Noteholders' Action are referred to here as the "Noteholders."
The Rieger Action plaintiffs are (a) Cerberus Capital Management, L.P. ("Cerberus"), an institutional investment firm which purchased $15.75 million (U.S.) face value Notes for $8.93 million from September 2 to November 6, 1998, (b) Tri-Links Investment Trust ("Tri-Links"), which purchased $21.777 million face value Notes for $8.88 million from December 8, 1998 to April 2, 1999, and (c) Alice F. Rieger, added as a plaintiff in the first amended complaint, who purchased $25,000 in Livent Notes for $25,096 on July 21, 1998. See Rieger Action First Amended Class Action Complaint ("RC") ¶¶ 11-13. Collectively, Tri-Links, Cerberus, and Rieger are referred to here as the "Rieger Noteholders." The Noteholders and the Rieger Noteholders are referred to collectively as "Plaintiffs."

B. DEFENDANTS

The various defendants,[3] subdivided into several groups, are individuals who served as Livent officers or directors, and corporations and institutions that played a role in Livent's financing or accounting.

1. Inside Directors/Management Defendants

Garth A. Drabinsky ("Drabinsky") served as chair of Livent's board of directors (the "Board") and chief executive officer from December 1989 to June 1998, and then as vice chair and chief creative director until August 1998. On August 10, 1998, he was suspended, and on November 18, 1998, he was fired. NH SAC ¶ 13.
Myron Gottlieb ("Gottlieb") served on the Board from 1993 to 1998, and was Livent's president and chief operating officer from December 1989 to June 1998, and executive vice-president of Canadian administration from June to August 1998. Along with Drabinsky, he was suspended on August 10, 1998 and fired on November 18, 1998. On January 13, 1999, both Drabinsky and Gottlieb were indicted in this District for securities fraud, and the United States Securities and Exchange Commission ("SEC") instituted a civil action against them for securities fraud. NH SAC ¶ 14.
Gordon Eckstein ("Eckstein") was Livent's senior vice president of finance and administration from February 1990 until his resignation in July 1998. In January 1999, Eckstein pleaded guilty to one felony *386 count of federal securities violations. NH SAC ¶ 15; RC ¶ 18.
Robert Topol ("Topol") was Livent's executive vice president from 1989 until 1994, when he became senior executive vice president. He became chief operating officer in 1996 until his resignation in February 1998. Topol signed the Registration Statement filed with the SEC in the public offering of the Notes. NH SAC ¶ 16; RC ¶ 20.
Collectively, Drabinsky, Gottlieb, Eckstein, and Topol, along with the other Livent management defendants, are sometimes referred to here as the "Inside Directors".
Maria Messina ("Messina"), sued here by the Noteholders but not by the Rieger Noteholders, was vice president of finance and chief financial officer of Livent. Prior to joining Livent in 1996, Messina was the engagement partner from Deloitte & Touche, Chartered Accountants for the audit of Livent's financial statements. Messina signed the Registration Statement filed with the SEC in the public offering of the Notes. On January 13, 1999, Messina was indicted in this District for securities fraud and pleaded guilty. NH SAC ¶ 17; RC ¶¶ 23-24.
Daniel D. Brambilla ("Brambilla") was first employed by Livent as a managing director in 1992 and was an executive vice president with Livent since 1993, and during the Class Period. Brambilla signed the Registration Statement filed with the SEC in the public offering of the Notes. NH SAC ¶ 21.
Lynda Friendly ("Friendly") was first employed by Livent as an executive vice president in December 1989 and became a director in May 1993. Friendly signed, by a power of attorney, the Registration Statement filed with the SEC in the public offering of the Notes. NH SAC ¶ 22.
Christopher Craib ("Craib") was, during the relevant period, Livent's senior controller. Craib joined Livent in June 1997 from Deloitte & Touche. During the Class Period, Craib prepared schedules comparing the actual and budgeted results, which quantified certain of the accounting irregularities that are a subject of this action. NH SAC ¶ 27.
Diane J. Winkfein ("Winkfein") was, during the relevant period, Livent's senior corporate controller. During the Class Period, Winkfein made adjustments to various accounts in the balance sheet and income statement, including expense categories to achieve overall levels of adjustments as part of the scheme to inflate Livent's profits. NH SAC ¶ 28; RC ¶ 24.
D. Grant Malcolm ("Malcolm") was, during the relevant period, Livent's senior production controller. During the Class Period, Malcolm made adjustments to various accounts in the balance sheet and income statements, including expense categories to achieve overall levels of adjustments as part of the scheme to inflate Livent's revenues. NH SAC ¶ 29.
Tony Fiorino ("Fiorino") was, during the relevant period, Livent's theater controller. During the Class Period, Fiorino created dummy accounts to conceal costs that were fraudulently shifted from shows to theater cost accounts. His purpose was to inflate Livent's profits by reducing recorded costs. He also inflated ticket sales for "Ragtime" and arranged for ticket purchases by vendors and handled payments to vendors. NH SAC ¶ 30; RC ¶¶ 29-30.

2. Outside Directors

H. Garfield Emerson ("Emerson") was a member of Livent's Board and chaired the Audit Committee at all relevant times during the Class Period. NH SAC ¶ 18.
*387 Martin Goldfarb ("Goldfarb") was a member of Livent's Board and served on the Audit Committee at all relevant times during the Noteholders Class Period. NH SAC ¶ 19.
A. Alfred Taubman ("Taubman") was a member of Livent's Board and served on the Audit Committee from April 1997 to August 1998. NH SAC ¶ 20.
Emerson, Goldfarb and Taubman collectively are sometimes referred to here as the "Audit Committee".
Thomas H. Lee ("Lee") became a director in February 1995 and served on Livent's Compensation Committee. He signed, by a power of attorney, the Registration Statement filed with the SEC in the public offering of the Notes. NH SAC ¶ 23.
James A. Pattison ("Pattison") was a director of Livent and a member of its Compensation Committee from May 1997. On October 1, 1998 Pattison was added to Livent's Audit Committee. He signed, by a power of attorney, the Registration Statement filed with the SEC in the public offering of the Notes. NH SAC ¶ 24.
Joseph L. Rotman ("Rotman") was a director of Livent from May 1995 and served on Livent's Executive Committee. He signed, by a power of attorney, the Registration Statement filed with the SEC in the public offering of the Notes. NH SAC ¶ 25.
Scott Sperling ("Sperling") was a director and member of Livent's Executive Committee from February 1995, when Thomas H. Lee Equity Partners, L.P. and THL-CCI Limited Partnership acquired $15 million of 8.95% Subordinated Convertible Notes due February 29, 2000, issued for 763,636 shares of Livent stock. He signed, by a power of attorney, the Registration Statement filed with the SEC in the public offering of the Notes. NH SAC ¶ 26.
Along with the three members of the Audit Committee defendants Lee, Pattison, Rotman and Sperling collectively are sometimes referred to here as the "Outside Directors".

3. Securities Sellers

CIBC Wood Gundy Securities, Inc. ("CIBC Wood Gundy") is a wholly-owned subsidiary of Canadian Imperial Bank of Commerce ("CIBC"), headquartered in Toronto, Canada and served as Livent's principal banker. NH SAC ¶ 31.
CIBC Oppenheimer Securities Corp. ("CIBC Oppenheimer") (known until December 31, 1997 as CIBC Wood Gundy Securities Corp.) is a wholly-owned subsidiary of CIBC Wood Gundy and serves as its broker/dealer for securities transactions in the United States. NH SAC ¶ 32.
Plaintiffs allege that CIBC Wood Gundy served as an underwriter of the Notes that were sold pursuant to the Registration Statement and Prospectus and that it sold those notes directly to investors in the United States, through its agent CIBC Oppenheimer, pursuant to the Prospectus. NH SAC ¶ 33.
Furman Selz, Inc. ("Furman Selz"), an indirect wholly-owned subsidiary of ING Group, N.V., is an investment bank headquartered in New York. Plaintiffs allege that Furman Selz was an underwriter of the Notes and that it "offered and sold the Notes directly to the investing public, pursuant to the Prospectus contained in the Registration Statement." NH SAC ¶ 34.
PaineWebber Inc. ("PaineWebber"), a wholly-owned subsidiary of the Paine Webber Group Inc., has headquarters in this District. Plaintiffs allege that PaineWebber was an underwriter of the Notes and that it offered and "sold the Notes *388 directly to the investing public, pursuant to the Prospectus contained in the Registration Statement." NH SAC ¶ 35.

4. Auditors

Deloitte & Touche, Chartered Accountants ("D & T" or "Deloitte") is a Canadian firm of certified public accountants, auditors and consultants, and is affiliated with Deloitte & Touche, LLP ("D & T U.S."), a United States limited liability partnership, which offers similar services as its Canadian counterpart. Deloitte served as Livent's outside auditor and accounting firm at all relevant times during the Class Period. Deloitte acted in that capacity pursuant to the terms of contracts it had with Livent which required Deloitte, among other things, to audit Livent's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS") and to report the results of those audits to Livent and its Board. Deloitte consented to the inclusion of its Auditor's Report in the Registration Statement and Prospectus for Livent's Notes, which Plaintiffs contend falsely and/or misleadingly stated that the consolidated financial statements present fairly, in all material respects, the financial position of Livent. NH SAC ¶ 36.

5. Nominal Defendants

Nominal defendant Livent is a Canadian corporation. On November 19, 1998, Livent filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code. Prior to liquidation of its primary assets, Livent owned and operated the Ford Theater in New York City and the Oriental Theater in Chicago, Illinois. NH SAC ¶ 37.
Nominal defendants Livent (U.S.) Inc., Livent Capital, Inc., Livent Int'l, Inc., Livent Realty (New York), Inc., and Livent Realty (Chicago), Inc. (the "Livent Affiliates") are wholly-owned subsidiaries of Livent. Each of the Livent Affiliates signed the Registration Statement and are Guarantors of the Notes. The Livent Affiliates filed for Chapter 11 protection concurrently with the bankruptcy filing of Livent in November 1998. NH SAC ¶ 38.

6. Additional Rieger Action Defendants

By reason of the overlap of time periods covered by the two actions, the Rieger Noteholders sued most of the defendants listed above, and added the following.
Conrad Black ("Black") was a member of the Livent Board beginning in 1993. Black, together with Rotman, Sperling, Lee, and Pattison, who are also named in the Noteholders Action, are referred to herein as the "Old Directors." RC ¶ 39.
Lynx Ventures, L.P. acquired 2.5 million common shares of Livent stock for $20 million on June 12, 1998. Lynx Ventures, L.L.C. is the general partner of Lynx Ventures, L.P. Lynx Ventures, L.P. and Lynx Ventures, L.L.C. are collectively referred to here as "Lynx." RC ¶ 45-46.
Michael S. Ovitz ("Ovitz"), a managing member of Lynx Ventures, L.L.C., served on Livent's board from June 12, 1998. RC ¶ 47.
Ronald Burkle ("Burkle") is the managing partner of the Yuciapa Companies and served on the Livent Board starting on June 12, 1998 until his resignation on December 1, 1998. RC ¶ 48.
Robert M.D. Cross ("Cross") is the chairman and CEO of Yorktown Securities, Inc. and served on the Livent Board starting on June 12, 1998. RC ¶ 49.
Quincy Jones ("Jones"), president of Quincy Jones Productions, served on the Livent Board from June 12, 1998 until his resignation on November 25, 1998. RC ¶ 50.
*389 Heather Munroe-Blum ("Munroe-Blum"), a professor at the University of Toronto, served on the Livent board from June 12, 1998 until her resignation on December 1, 1998. RC ¶ 51.
Jerry Speyer ("Speyer"), president and CEO of Tishman Speyer Properties, Inc, served on the Livent Board from June 12, 1998 until his resignation on December 1, 1998. RC ¶ 52.
Roy Furman ("Furman") retired from Furman Selz in April 1998 to become chairman and CEO of Livent, serving from June 12, 1998, until June 25, 1999, when he resigned. RC ¶ 53.
Ovitz, Burkle, Cross, Jones, Munroe-Blum, Speyer, and Furman are collectively referred to as the "New Directors."

III. LIVENT'S BACKGROUND AND DEMISE

A. PUBLIC FINANCINGS AND LOSSES

Livent was formed in 1989 as a partnership between Drabinsky and Gottlieb. In May 1993, Livent made an initial offering of stock in Canada. Two years later, in May 1995, Livent filed a registration statement with the SEC that sought to sell Livent common stock in the United States and to list that stock on the NASDAQ exchange. That application was accepted and, in August 1995, Livent's stock began publicly trading in the United States. Livent often sought financing from U.S. and Canadian investors, sometimes by selling notes and debentures and sometimes with additional stock offerings.
The public financing in contention here began in October 1997, when Livent issued an offering memorandum (the "Offering Memorandum") for the sale of the Notes in the United States and Canada. On October 10, 1997, Livent formally announced that the debt offering had closed and had netted proceeds of $121 million (U.S.). On October 16, 1997, as contemplated in the Offering Memorandum, Livent entered into an Indenture, with Wilmington Trust Company as Trustee, to exchange the original Notes for publicly traded Notes to be issued in December 1997. On November 6, 1997, Livent filed a Registration Statement with the SEC regarding this exchange offer (the "Registration Statement"); and, on December 10, 1997, Livent filed its completed exchange offer Prospectus with the SEC (the "Prospectus"). NH SAC ¶ 2.
On April 13, 1998, Livent announced that it had suffered a net loss in 1997 of $44.1 million. RC ¶ 244. Livent also announced a $27.5 million write-off of production costs and a $12.2 million charge consisting primarily of costs associated with the refinancing of Livent's debt in the fourth quarter of fiscal year 1997. See Declaration of Peter J. Beshar (counsel to Deloitte) in support of motion to dismiss the RC, dated April 17, 2000 ("Beshar Decl."), Ex. C (Livent's Form 6-K for the month of April, 1998, attaching Livent's Press Release dated April 13, 1998).
During the same period Lynx conducted due diligence on Livent with the assistance of KPMG Investigation and Security, Inc. ("KPMG"). After KMPG completed its due diligence, Lynx agreed to invest $20 million in return for a 12% ownership stake in Livent. Robert Webster ("Webster") was then appointed executive vice president of Livent.
On May 29, 1998, Livent disclosed a loss in the First Quarter of 1998 of $29.9 million. Livent also announced a further $23.6 million write-off of preproduction and other assets, of which $20.4 million related to "Show Boat". Beshar Decl. Ex. D (Livent's Form 6-K for the three months ended March 31, 1998). As the Noteholders *390 characterize it, at that time "Livent was losing money at an alarming rate." NH SAC ¶ 126.

B. LIVENT'S FRAUD UNCOVERED

In early August 1998, Webster learned that Livent had entered into a "secret side agreement" with CIBC in connection with a particular transaction. NH SAC ¶ 131. On August 6, 1998, several Livent employees approached Webster and disclosed that there were substantial financial irregularities at Livent. NH SAC ¶ 132.
On August 10, 1998, after conducting a brief investigation, Livent issued a press release (the "August 10 Press Release" or "Initial Press Release") entitled "Investigation at Livent Inc. Reveals Accounting Irregularities." RC ¶¶ 162-171, 388; Beshar Decl., Ex. A (Livent's Form 6-K, dated August 11, 1998, incorporating Livent's August 10 Press Release). This release disclosed that significant financial irregularities had been uncovered and that a restatement of Livent's 1996, 1997, and first quarter 1998 financial results would be necessary. Id. The Initial Press Release also announced that KPMG had been retained to conduct "a comprehensive review of [Livent's] financial records" and that Drabinsky and Gottlieb had been suspended pending KPMG's investigation. Id.
The press release further stated that the accounting irregularities "are not expected to have a significant adverse effect on [Livent's] current cash flow or its operations" and that "[Livent] expects shortly to engage investment advisors to assist in addressing these issues and believes that it should be possible to resolve these issues satisfactorily." Id. at 3-4.
At the same time, the Initial Press Release cautioned that the accounting irregularities "could give rise to an event of default or trigger obligations under [Livent's] outstanding indebtedness and other agreements" and warned that the views expressed
are subject to various known and unknown risks and uncertainties including, but not limited to, the outcome of the investigation referred to herein: the profitability of [Livent's] present and planned productions and other projects; competition in [Livent's] existing and potential future lines of business; [Livent's] ability to address its financing requirements in light of its existing debt obligations; [Livent's] ability to attract and retain key executive and creative personnel; and other factors. These and other factors and assumptions not identified above could cause actual results to differ materially from those projected.
Id. at 4.
Following the August 10 Press Release, NASDAQ and the Toronto Stock Exchange halted all trading in Livent stock.
On August 18, 1998, Livent issued another press release, entitled "Livent Outlines Current Status of Investigation and Ongoing Business Operations" (the "August 18 Press Release" or "Second Press Release"). Beshar Decl., Ex. B (Livent's Form 6-K, dated August 20, 1998, incorporating Livent's August 18 Press Release). This Second Press Release reported that Livent was targeting late October to restate its financials, and warned that the adjustments "will be material in the aggregate for 1996, 1997, and for the first quarter of 1998" and that "earlier years might be affected" as well. Id. at 1. The August 18 Press Release provided more information about the accounting irregularities:
It still appears that the irregularities generally involve two areas: (1) expense recognition issues involving the failure to record expenses in proper periods *391 due to improper capitalization of costs and other means, and (2) improper recognition of revenue.
* * * * * *
Livent believes that the majority of the restatements will involve expenses that had been shifted among prior reporting periods. These items do not appear to have an effect on Livent's recorded equity as of March 31, 1998. [Livent] cautioned that the remaining minority of expense-related restatements is likely to reduce significantly shareholders' equity .... It is too early to quantify the magnitude of any of these expense-related restatements.
* * * * * *
Livent also said that the restatement of revenue recognition appears principally to involve one of its three categories or revenues: `other,' which includes, among other things, sponsorships, theater naming rights, the sale of rights in Livent shows to third parties, and the sale of exclusive booking rights to shows. These `other' revenues accounted for approximately 11% and 13% of [Livent's] reported net revenue in 1996 and 1997, respectively.... It is still too early to quantify either the total amount of affected `other' revenues or how much of this affected `other' revenues may actually be reversed in its restatement of results.
* * * * * *
[Livent's] two other revenue sources are from performances, which includes ticket sales to its shows at either Livent-owned venues or third-party venues, and are by far its most significant source of revenues, and from merchandising. Only a few instances of irregularities have been uncovered affecting previously reported performance and merchandising revenues. [Livent] emphasized, however, the investigation is continuing.
Id. at 1-6.
Meanwhile, several class action suits were filed against Livent, including twelve in the month of August 1998 alone. Some related to Livent transactions involving the sale of Livent stock and others to the Notes at issue here. The August 1998 complaints referenced Livent's August 10 Press Release and generally alleged that Livent's financial statements for 1996, 1997, and the first quarter of 1998 materially overstated Livent's income by improperly recognizing revenue, improperly deferring expenses that should have been recorded, and improperly deferring expenses from shows that were currently running to shows with a longer amortization period.[4]

C. LIVENT'S BANKRUPTCY

On November 18, 1998, Livent filed for Chapter 11 bankruptcy protection in the United States and released its restated financial results for 1996, 1997 and the *392 first quarter of 1998, disclosed that investigations had revealed "`massive, systematic, accounting irregularities that permeated the Company'" and further announced, as a result, that D & T had withdrawn its audit opinions of the 1995, 1996, and 1997 financial statements and had issued new audit opinions on the restated 1996 and 1997 financial results. NH SAC ¶ 136. That same day, Livent terminated Drabinsky and Gottlieb and sued them for fraud and breach of fiduciary duty. NH SAC ¶ 137.
Trading in Livent common stock resumed following Livent's restatement, and the price immediately dropped from $6.75 to approximately $0.28 per share.

D. THE INSTANT ACTIONS

1. The Noteholders' Action

In October 1998, the Kings filed their first class action complaint and moved to be appointed as lead plaintiffs. On February 17, 1999, Judge Sweet denied the Kings' motion because of their failure to publish the notice required under the PSLRA. See King v. Livent, 36 F.Supp.2d 187, 190 (S.D.N.Y.1999). In March 1999, the Kings filed a second complaint, published the notice mandated by the PSLRA, and again moved to be appointed lead plaintiffs. In June 1999, Judge Sweet consolidated the pending Noteholders class actions and appointed the Kings lead plaintiffs with regard to Livent Notes issued for the period of October 10, 1997 through August 10, 1998. Judge Sweet also laid out procedures for consolidating later filed related cases:
Each new case that arises out of the same subject matter of the [Noteholders Action] which is filed in this Court or transferred to this Court, shall be consolidated with the [Noteholders Action] and this Order shall apply thereto, unless a party objects to consolidation, as provided for herein, or any provision of this Order, within 10 days after the date upon which a copy of this Order is served on counsel for such party, by filing an application for relief, and this Court grants such application.
In re Livent, Inc. Noteholders Secs. Litig., No. 98 Civ. 7161 (S.D.N.Y. June 18, 1999).
In August 1999, the Kings filed a third complaint. In December 1999, in connection with the action brought by principal Livent shareholders, Judge Sweet granted the motion of D & T and certain Outside Directors to dismiss the complaint, with leave to replead certain aspects of the claims. See In re Livent Sec. Litig., 78 F.Supp.2d 194, 218 (S.D.N.Y.1999). In a separate ruling on February 14, 2000, Judge Sweet dismissed with prejudice a Securities Act § 11 claim by Livent shareholders against D & T and others related to Livent's March 1996 equity offering. See Griffin v. PaineWebber, 84 F.Supp.2d 508, 511-12 (S.D.N.Y.2000).
In the wake of these two dismissals, the Noteholders filed the instant complaint the Second Amended Consolidated Class Action Complaint  on March 13, 2000.

2. The Rieger Action

In September 1999, Cerberus and Tri-Links filed a putative class action complaint also related to the Livent Notes. The proposed class period covered purchases of the Notes anytime after August 10, 1998. In March 2000, Cerberus and Tri-Links filed an amended class action complaint adding Rieger as a plaintiff, naming additional defendants, and broadening the class period to cover from October 10, 1997 to the present. The Rieger Noteholders published a notice of pendency advising Livent Noteholders who purchased their securities "anytime after *393 October 10, 1997," that they could move to be appointed lead plaintiff for the class.
In May 2000, Rieger, Cerberus, and Tri-Links moved to be appointed lead plaintiffs. The Kings, meanwhile, as lead plaintiffs in the Noteholders Action, moved to enjoin the Rieger Action.
Both the Noteholders and the Rieger Noteholders base their claims on substantially the same allegations described below. Tri-links and Cerberus, however, base some of their claims in part on Livent's August 10 and 18 Press Releases and subsequent activities as discussed below.

IV. THE ALLEGED FRAUD

A. FRAUDULENT "REVENUE-GENERATING" TRANSACTIONS

1. Pace Theatrical Group

In 1996 and 1997, Livent purported to sell to Pace Theatrical Group, Inc. ("Pace"), a Texas-based theatrical company, the exclusive rights to present "Show Boat" and "Ragtime" in various theaters in North America for fees totaling $11.2 million (U.S.). NH SAC ¶ 67; RC ¶ 233. These agreements, contained in contracts or letters, were dated June 15, 1996 and August 8, 1997, with respect to "Show Boat", and December 18, 1996 and August 8, 1997, with respect to "Ragtime". NH SAC ¶ 67; RC ¶ 234. In return for payment of the fees, Pace was to be reimbursed for all theater expenses to present the shows and was entitled to a limited percentage of adjusted gross ticket sales as profit participation. NH SAC ¶ 67; RC ¶ 238. All of these agreements purported to make the fees nonrefundable, even if Livent never made the shows available to Pace. NH SAC ¶ 67; RC ¶ 238.
Nevertheless, on the basis of these agreements, and allegedly in violation of Generally Acceptable Accounting Principles ("GAAP"), Livent recognized the present value of the fees as revenue in its financial statements in the amounts of $12.2 million for fiscal 1996 and $1.6 million for fiscal 1997. NH SAC ¶ 68; RC ¶ 242. For purposes of Livent's year-end 1996 reconciliation to U.S. GAAP, Livent deferred recognition of $6 million related to the sale of rights to "Ragtime". NH SAC ¶ 68; RC ¶ 243. Livent subsequently improperly recognized that amount in fiscal 1997. NH SAC ¶ 68; RC ¶ 243.
According to the Rieger Noteholders, however, the agreements did not actually require any irrevocable payments by Pace. Pace required side letters to these agreements that granted Pace the right to recoup its fees, plus earn additional profit, as the shows were performed. RC ¶¶ 239-41.

2. American Artists

In 1997, pursuant to an agreement dated September 9, 1997, Livent sold American Artists Limited, Inc. ("American Artists"), a Massachusetts-based theater owner and operator, the right to present "Ragtime" in three theaters for a fee of $4.5 million (U.S.). NH SAC ¶ 92; RC ¶ 247. The agreement purported to make the fee nonrefundable, regardless of whether Livent made "Ragtime" available to American Artists. NH SAC ¶ 92; RC ¶ 247.
Two side letters, dated September 29 and November 15, 1997, signed by Topol and by American Artists, permitted American Artists to recoup its fees in two ways: through fixed weekly amounts when the shows were performed, and through "consulting fees" for the services of American Artists' president, Jon Platt. NH SAC ¶ 92; RC ¶ 248. Livent recognized approximately $5.8 million (Can.), the present value of the fee, in its financial statements for the third quarter of 1997 and fiscal 1997. NH SAC ¶ 92; RC ¶ 248.

*394 3. CIBC Wood Gundy

In December 1997, Gottlieb negotiated an agreement (the "CIBC Wood Gundy Agreement") purporting to memorialize the sale of an interest in the production rights of "Show Boat" and "Ragtime" in the United Kingdom and other countries to CIBC Wood Gundy. NH SAC ¶ 94; RC ¶ 252. In return, CIBC Wood Gundy was entitled to certain royalty payments from the shows. NH SAC ¶ 94; RC ¶ 254. The Rieger Noteholders allege that the royalty would be received if, and only if, "Show Boat" or "Ragtime" was actually produced by Livent in the European territories specified in the agreement. Valued at $4.6 million (Can.), the agreement also gave Livent the right, until June 30, 1998, to repurchase the production rights. NH SAC ¶ 94; RC ¶ 253-54. Under the agreement, the fee from CIBC Wood Gundy was non-refundable, NH SAC ¶ 94; RC ¶ 253, and Livent had no obligation to stage the plays or to exercise its repurchase option, RC ¶ 254. Based on this agreement, Livent recorded revenue of approximately $4.6 million (Can.) in its financial statements for fiscal 1997. NH SAC ¶ 94; RC ¶ 264.
According to the Noteholders, the CIBC Wood Gundy Agreement was reviewed by D & T as part of its 1997 audit of Livent. "Although fully aware that the contract required Livent to perform over a period of years, [D & T] acquiesced to Livent's insistence that all revenue be booked in 1997  so long as a corresponding amortization liability was also recorded." NH SAC ¶ 94. Thus, the transaction inflated revenue and earnings before interest, taxes, depreciation and amortization (EBITDA), but not earnings, net interest, taxes, depreciation and amortization. NH SAC ¶ 94.
However, Gottlieb purportedly negotiated a secret side letter-agreement with CIBC Wood Gundy. NH SAC ¶ 96; RC ¶ 257. The side letter provided two mechanisms for CIBC Wood Gundy to recoup its fees and make significant profits. If Livent exercised the repurchase option, Livent would repay all fees, plus £112,500.00, plus any unpaid royalties; if Livent did not exercise the repurchase option, Livent would pay CIBC Wood Gundy an additional royalty equal to 10 percent of the adjusted gross weekly ticket sales of the Broadway production of "Ragtime". NH SAC ¶ 96; RC ¶ 259. Under this arrangement, CIBC Wood Gundy was guaranteed a minimum of an annualized 33 percent return on its original investment, regardless of which option Livent chose. NH SAC ¶ 96; RC ¶ 259. The purported "royalty purchase" was thus in fact a loan. NH SAC ¶ 97. The transaction was designed to provide Livent with "bridge" financing until it could sell the production rights to a U.K. investor after "Ragtime" opened on Broadway in early 1998. NH SAC ¶ 99. When it became clear in early August 1998 that Livent's new management did not know about the side agreements, Gottlieb asked the managing director of CIBC Wood Gundy who negotiated the transaction not to disclose the side agreements to new management so that Gottlieb could cause Livent to repurchase the rights from CIBC Wood Gundy. NH SAC ¶ 99.
Plaintiffs assert that the false terms of the CIBC Wood Gundy Agreement were used to mislead the investing public into believing that CIBC Wood Gundy had confidence in the future performance of the European productions that were the subject of the agreement, and confidence in its longstanding client, Livent. In truth, as revealed by the secret terms of the agreement, CIBC Wood Gundy had no confidence in the value of the contemplated European productions or in Livent's ability *395 to repay CIBC Wood Gundy's $4.6 million loan. NH SAC ¶ 100; RC ¶ 255-56.

4. Dundee Realty Corporation

In May 1997, Livent acquired from the City of Toronto title to lands adjoining the Pantages Theater (the "Pantages Place Lands"). RC ¶ 268; NH SAC ¶ 78. A portion of the Pantages Place Lands were to be used for a new theater, an underground parking garage, and retail space (collectively the "Pantages Place Project"). RC ¶ 268; NH SAC ¶ 78.
Drabinsky and Gottlieb advised the Board that at the end of the second quarter of 1997, Livent had sold the development rights over the land not used by the Pantages Place Project for $7.4 million (Can.) to a third-party, Dundee Realty Corporation ("Dundee"), a Canadian company. NH SAC ¶ 78; RC ¶ 269. Gottlieb was a director and shareholder of Dundee's parent corporation, Dundee Bancorp Inc. RC ¶ 269; NH SAC ¶ 78. Livent failed, however, to disclose this agreement as a related party transaction in its fiscal 1997 annual report. NH SAC ¶ 78. The purpose of this sale was to enable Dundee to construct a hotel and condominium adjacent to the Pantages Place Project. RC ¶ 270; NH SAC ¶ 78. Livent was also to receive a minority interest in the development company owned by Dundee that was to construct the hotel and condominium. NH SAC ¶ 78.
Under the master agreement for the project, dated June 30, 1997, Livent and Dundee created a joint venture company. RC ¶ 269; NH SAC ¶ 79. However, the parties entered into a related "Put" agreement (the "Put Agreement") that entitled Dundee to withdraw from the project and cause the joint venture, and therefore Livent, to repay Dundee's investment. RC ¶ 271; NH SAC ¶ 79.
In August 1997, the Audit Committee questioned Gottlieb about the timing of the transactions and whether revenue had been properly recognized for the second quarter of FY 1997. NH SAC ¶ 80; RC ¶ 272. According to Plaintiffs, under GAAP, the Put Agreement created a material contingency preventing recognition of the $7.4 million as income in 1997. NH SAC ¶ 88; RC ¶ 278. Over Drabinsky's objections, D & T was asked for an opinion with respect to revenue recognition. Peter Chant of Deloitte reviewed the contract and opined that, because the contract contained a "put" agreement that would require Livent to buy back the same rights at Dundee's request, the sale was not final and revenue should not be recognized. NH SAC ¶ 81.
Gottlieb then represented to the Board and D & T that the Put Agreement had been cancelled. NH SAC ¶ 82; RC ¶ 273-74. D & T then informed Gottlieb that because the Put Agreement had been removed in August 1997, revenue should be recognized only in the third quarter. Gottlieb ignored this advice, and issued a press release stating revenue for the second quarter which included the development rights revenue.
When Bob Wardell ("Wardell") of D & T learned of the press release, he contacted Gottlieb and demanded a meeting with Livent's Audit Committee. At the meeting, Gottlieb explained that in his opinion the Dundee contract had been finalized in the second quarter, and that he would procure confirmation from Dundee and an opinion of counsel supporting his position. NH SAC ¶ 83.
A few days later, at a second special meeting of the Audit Committee with D & T present, Gottlieb presented the legal opinion and purported confirmation from Dundee. NH SAC ¶ 84. Nonetheless, D & T initially refused to accept the accounting *396 treatment and threatened to resign. NH SAC ¶ 84. Gottlieb told the Audit Committee that D & T should resign. NH SAC ¶ 85. Goldfarb said that would be unacceptable and that D & T's resignation would cause too much damage to Livent's reputation. NH SAC ¶ 85. With D & T representatives absent from the room, the Board members agreed that they would be willing to reverse the revenue recognition, provided some of the revenue could be made up in the second quarter, and that a corrective press release be issued. NH SAC ¶ 85.
Eventually, D & T and the Audit Committee agreed that Livent would reverse the $6 million revenue line, but would also increase other revenue by $1.2 million by reversing an assortment of accrued liabilities. In this connection, Livent issued a press release which stated in part that "Livent, Inc.... has adjusted its accounting treatment for non-theatre real estate transactions to be consistent with U.S. GAAP." NH SAC ¶ 86.
The Put Agreement issue rose again in discussion with the Audit Committee during the year-end audit in April 1998. NH SAC ¶ 82; RC ¶ 273-74. On April 9, 1998, Gottlieb expressly stated to the Audit Committee that no such put agreement or arrangement existed and provided a letter from the Chairman of Dundee as confirmation. NH SAC ¶ 89-90; RC ¶ 274. However, in a letter dated April 6, 1998 to Dundee's President, Drabinsky and Gottlieb confirmed to Dundee that the Put Agreement was in place and effective as between Livent and Dundee. NH SAC ¶ 90; RC ¶ 276. The letter read in pertinent part as follows: "[W]e wish to confirm that notwithstanding [Dundee's Chairman] letter to me of April 4, 1998, a copy of which is attached hereto, the "PUT" agreement referred to in [Dundee's Chairman] letter is binding and effective and remains so in favor of Dundee ... as if it had never been cancelled." NH SAC ¶ 90; RC ¶ 276.
Plaintiffs allege that revenue recognition from this transaction violated GAAP. First, according to Plaintiffs, any oral agreement to cancel the Put Agreement was contingent upon Gottlieb renegotiating the joint venture agreement to ensure to Dundee's satisfaction that Dundee's rights remained secure. NH SAC ¶ 91. Thus, even if the Put Agreement was cancelled, recognition of revenue was improper because the contract was not a final, consummated sale. Second, on May 27, 1998, Gottlieb and Dundee executed a new Put Agreement. NH SAC ¶ 91; RC ¶ 277. Gottlieb's and Drabinsky's April 6, 1998 letter "reinstating" the Put Agreement, and the new May 27, 1998 Put Agreement, confirm that Gottlieb and Drabinsky considered it to be binding on Livent. NH SAC ¶ 91. Accordingly, the existence of the Put Agreement made the transaction an investment that did not qualify for revenue recognition under GAAP. NH SAC ¶ 91; RC ¶ 278.

5. Pantages Theatre Naming Rights

Livent sought to recognize as revenue $12.5 million for a purported sale of naming rights to the Pantages Theatre to AT & T for the third quarter of fiscal 1997. NH SAC ¶ 101. Livent purportedly sold AT & T the right to add its name on two theaters, one of which had not yet been built. NH SAC ¶ 101. Although there had not been any firm contract by the end of the third quarter, Livent wanted to record the revenue immediately based on its plans to allow the name change to the Pantages. NH SAC ¶ 101.
In October, 1997, Messina discussed the Pantages naming "transaction" with D & T's Wardell and Chant, and all three agreed that the revenue could not be recognized *397 in the third quarter. Gottlieb, an accountant by profession, retained Ernst & Young ("E & Y") for the purpose of receiving an independent opinion on the naming revenue. NH SAC ¶ 102. While E & Y would not opine that the revenue could be recognized in the third quarter, it did state that the transaction could be considered within the third quarter. NH SAC ¶ 102. Gottlieb provided Deloitte with E & Y's opinion regarding the transaction and asked that it be included in the accounting for the third quarter. NH SAC ¶ 102.
D & T retained another accounting firm, Price Waterhouse, to render another professional opinion. Price Waterhouse met with Gottlieb and AT & T and concluded that an oral contract could be considered to have occurred in the third quarter. NH SAC ¶ 103. Price Waterhouse did not opine on the specific issue of revenue recognition with respect to the oral contract. NH SAC ¶ 103.
After receiving this information, D & T acquiesced to recording the naming revenue in the third quarter. NH SAC ¶ 104. The written contract for the name change was thereafter signed in November 1997. NH SAC ¶ 104.

6. Dewlim Investments Limited

In 1996, Gottlieb negotiated the sale of an interest in the production rights to "Show Boat" in Australia and New Zealand to Dewlim Investments Limited ("Dewlim"), a British Virgin Islands company, for $4.5 million. NH SAC ¶ 71; RC ¶ 284. The original agreement was dated October 21, 1996, and revised by agreement dated November 3, 1997. NH SAC ¶ 71; RC ¶ 284. As with the other rights sales, the sale agreement made the fee non-refundable. NH ¶ 71; RC ¶ 284.
Plaintiffs allege that in October 1996, Gottlieb and Drabinsky orally promised Dewlim's then owner, Andrew Sarlos, that Livent would repay the fee Dewlim advanced for the production rights, plus 10 percent interest. NH SAC ¶ 71; RC ¶ 284. This arrangement is memorialized in a June 9, 1998 memo from Gottlieb to Drabinsky. NH SAC ¶ 71; RC ¶ 286. It states that as "an inducement" for the "Show Boat" transaction, "we committed to Dewlim on behalf of Livent that Dewlim would recoup by December 31, 2000 all capital together with interest accrued monthly at the rate of 10% per annum." NH SAC ¶ 71; RC ¶ 286. As a result of this concealed arrangement, Livent improperly recorded as revenue the present value of the fee, $4.2 million, in fiscal 1996; no revenue was recorded under U.S. GAAP in fiscal 1996 or 1997. NH SAC ¶ 71; RC ¶ 287.
This understanding was a related party transaction in two respects. First, at the time of the agreement, Sarlos was a director of Livent and chairman of Livent's Audit Committee. NH SAC ¶ 72; RC ¶ 285. Additionally, in October 1996, Gottlieb had pledged his personal Livent stock to Dewlim as security for the $4.5 million loan. NH SAC ¶ 72; RC ¶¶ 284, 288. Neither of these related party transactions was disclosed in Livent's annual report for fiscal 1996 or 1997. NH SAC ¶ 72; RC ¶ 288.
According to the Noteholders, even a cursory examination of the Dewlim agreement  even without the side agreement  raised red flags that Livent could not complete its terms of the agreement to justify the recognition of $4.2 million in 1996.
The Audit Committee reviewed the contents of the Dewlim, as well as the Pace, agreements. NH SAC ¶ 74. During one Audit Committee meeting, Goldfarb and Emerson stated that the revenue recognition in the agreements was improper, and *398 that some revenues should be amortized over several years. NH SAC ¶ 74. However, based on a report by D & T and representations of management, they agreed that the revenue could be recognized in 1996. NH SAC ¶ 74.
D & T also reviewed the terms of the Dewlim and Pace agreements, and knew that Messina opposed recognizing all the revenue on the agreements. NH SAC ¶ 75.
D & T's United States affiliate initially refused to permit Deloitte to file its Audit Opinion on Livent's 1996 U.S. GAAP financial statement with the SEC, because it agreed with Messina that revenue recognition had been improper with respect to those transactions. NH SAC ¶ 76. A meeting was held in New York in early 1998 to consider the proper accounting. Livent was represented by Drabinsky, Gottlieb, Topol, Messina, and Eckstein, and D & T Canada was represented by Wardell and Chant. NH SAC ¶ 76. D & T U.S. was represented by four partners. NH SAC ¶ 76.
At the meeting, the parties once again reviewed the two agreements. NH SAC ¶ 77. A compromise was then reached whereby the U.S. GAAP financial statements would recognize all of the revenue from the Pace "Show Boat" agreement at the time of signing, but could not recognize the revenue from the Pace "Ragtime" transaction until 1997. NH SAC ¶ 77. The revenue from the Dewlim agreement would not be recognized on U.S. GAAP financial statements. NH SAC ¶ 77. Deloitte based this decision on the fact that pre-production had begun for the Pace "Show Boat" production, but had not begun for "Ragtime" or for the Dewlim "Show Boat" production. NH SAC ¶ 77. The Canadian GAAP filings would not be restated or amended. NH SAC ¶ 77.

B. FRAUDULENT MANIPULATION OF LIVENT'S BOOKS AND RECORDS

Beginning in 1994 and continuing through the first quarter of 1998, Drabinsky and Gottlieb and several of the other individual management defendants engaged in deliberate manipulation of Livent's books and records, thereby understating expenses in each fiscal quarter in order to inflate earnings, and violating GAAP. NH SAC ¶ 95; RC ¶ 302. By redacting expenses on losing shows, Drabinsky and Gottlieb were able to portray the productions and Livent as financially successful. NH SAC ¶ 95; RC ¶ 302. In quarterly periods, this practice enabled Drabinsky, Gottlieb and Topol to meet the earnings and operating projections provided to Wall Street analysts. NH SAC ¶ 95; RC ¶ 302.
The Inside Directors engaged in three manipulative devices to falsify Livent's books: (a) transferring preproduction costs for shows to fixed asset accounts, which materially understated expenses; (b) physically erasing expense and liability entries from the company's general ledger; and (c) transferring costs from a currently running show to another show with a longer amortization period, which again materially understated expenses. NH SAC ¶¶ 106-20; RC ¶¶ 303-28.
Livent transferred preproduction costs for shows to fixed asset accounts. NH SAC ¶ 106; RC ¶ 303. Preproduction costs, such as costs for advertising, sets and costumes, are incurred prior to the opening of a production. NH SAC ¶ 107; RC ¶ 315. According to Livent's accounting policies, preproduction costs were to be amortized, and thus expensed, once a production began and only for a period not to exceed five years. NH SAC ¶ 107; RC ¶ 315. Fixed assets, in contrast, were depreciated over their useful life, not to *399 exceed forty years. NH SAC ¶ 107; RC ¶ 315. As a result, Livent significantly decreased expenses, and thus inflated its reported income, by improperly depreciating preproduction costs over a much longer period of time. NH SAC ¶ 107; RC ¶ 316. For example, in 1997 Livent transferred preproduction costs and certain show operating expenses totaling $15 million, representing six different shows in 30 different locations, to three different fixed asset accounts. NH SAC ¶ 107. By this manipulation, Livent violated GAAP and its own accounting policy. NH SAC ¶ 107.
Livent also physically erased expense and liability entries from its general ledger, moving these entries from the current quarter to future periods. NH SAC ¶ 108; RC ¶¶ 318, 321. Livent maintained a separate set of books, called the "Expense Roll," that internally tracked the amount of these eliminated entries. NH SAC ¶ 108; RC ¶ 319. This manipulation allowed Livent to falsely report significant reductions in show expenses, with attendant increases in profits. NH SAC ¶ 108; RC ¶ 320. For example, expenses rolled from the first to the second quarter of fiscal 1997 totaled $6.5 million. NH SAC ¶ 108; RC ¶ 320.
Livent also manipulated its financial statements by transferring costs from a currently running show to one that had either not yet opened or that had a longer amortization period. NH SAC ¶ 109; RC ¶ 323. This accounting manipulation increased profits in one quarter by reducing the amortization of preproduction costs, an expense item. NH SAC ¶ 109; RC ¶ 323. Under GAAP and Livent's own accounting policy, amortization of preproduction costs is only appropriate once a production has begun. NH SAC ¶ 109; RC ¶ 324. In 1996 and 1997, approximately $12 million relating to seven different shows performed at 27 different locations were transferred to the accounts of 31 different future locations and ten other shows then in progress. NH SAC ¶ 109; RC ¶ 324.
According to Plaintiffs' theory, any auditor or Audit Committee member who reviewed Livent's production schedule, or even read the trade publications or Variety magazine, would have noticed clear red flags of this accounting manipulation. Plaintiffs contend that D & T and the Audit Committee must have been aware of Livent's announced policy that costs of cancelled shows would be expensed at the time of cancellation. NH SAC ¶ 110. Plaintiffs contend that it was well known that particular shows had ended their runs. The absence of any writedown at the time of the show's end necessarily meant that Livent was not following its own stated accounting policy, let alone complying with GAAP. NH SAC ¶ 110; RC ¶ 328.
As had been done with the "Expense Rolls," Livent maintained a separate set of books called the "Amortization Roll," to internally track the amount of amortization moved from current to future periods. NH SAC ¶ 111; RC ¶ 324.
The cumulative impact of these accounting irregularities caused Livent to understate expenses by $3.5 million in fiscal year 1995, $18 million in fiscal year 1996, and $8.5 million in fiscal year 1997, and to overstate expenses by $2.7 million in the first quarter of fiscal year 1998. NH SAC ¶ 112.
Each of the manipulations described above was carried out by Livent's senior management and accounting department personnel. NH SAC ¶ 113. On a quarterly basis, Winkfein and Malcolm  Livent senior controllers  produced a general ledger showing quarterly financial results to Eckstein, and to Craib, another senior controller who then placed this information into summary format for Drabinsky, Gottlieb, *400 Eckstein, and Topol. NH SAC ¶ 115; RC ¶ 305. This group, along with Messina, then met to review the results. NH SAC ¶ 113; RC ¶ 307.
During these meetings, Drabinsky, Gottlieb, Eckstein, Topol, and Messina agreed on the quantity of top-line adjustments to be made to Livent's books to achieve the results they desired. NH SAC ¶ 112. Generally, Drabinsky directed that certain adjustments be made. NH SAC ¶ 114; RC ¶ 309. Eckstein noted the desired adjustments, and communicated the adjustments to Winkfein and Malcolm, instructing them to make the adjustments in such a way as to give the appearance that they were original entries. NH SAC ¶ 114; RC ¶ 309. Beginning in 1996, Malcolm communicated the transfers to fixed asset accounts to Fiorino, who recorded the adjustments in dummy theater cost accounts. NH SAC ¶ 114; RC ¶ 310.
Once the top-line adjustments were made, Winkfein or Malcolm provided Eckstein with an adjusted general ledger containing the accounting manipulations. NH SAC ¶ 115; RC ¶ 311. Drabinsky, Gottlieb, Topol, and Eckstein then met to review the manipulated results. NH SAC ¶ 115; RC ¶ 311. Drabinsky directed that further adjustments be made, which Winkfein or Malcolm processed in Livent's accounting system, under Eckstein's direction. NH SAC ¶ 115. After a final review by senior management, the manipulated numbers were presented to Livent's Audit Committee, Deloitte and investors, and were eventually incorporated into Livent's public filings with the SEC. NH SAC ¶ 115; RC ¶ 309.
Due to the sheer magnitude of the manipulations, it was necessary for the Inside Directors to track results both before and after the top-line adjustments were made. NH SAC ¶ 116; RC ¶ 312. At Eckstein's direction, Malcolm maintained computer files of the adjustments that tracked details of expense capitalization, expense rolls, and show-to-show cost transfers from 1995 to the first quarter of 1998. NH SAC ¶ 1116; RC ¶ 312. Fiorino also separately tracked the expenses that had been improperly transferred to theater construction accounts by creating a range of accounts in the general ledger and thereby measuring the true costs of Livent's theater construction program. NH SAC ¶ 116; RC ¶ 312.
To make the adjustments, Malcolm identified individual invoices to alter. NH SAC ¶ 117; RC ¶ 313. Then, on an invoice-by-invoice basis, he and Winkfein changed the distribution dates or account codes of these invoices, deleting the original entries from Livent's general ledgers and reposting fraudulent information. NH SAC ¶ 117; RC ¶ 313. This process had the effect of making the adjusted entries appear as original transaction figures. NH SAC ¶ 117; RC ¶ 313.
Beginning in mid-1997, Eckstein directed Craib to prepare quarterly schedules containing a comparison of actual and budgeted results. NH SAC ¶ 118; RC ¶ 306. These schedules, which contained the "Expense Roll" and the "Amortization Roll," quantified certain of the accounting manipulations. NH SAC ¶ 118; RC ¶ 306. Drabinsky, Gottlieb, Topol, Eckstein, and Messina met to review these schedules. NH SAC ¶ 118; RC ¶¶ 307-08. Beginning by at least October 1997, Messina prepared pre- and post-adjustment charts reflecting transferred amounts in detail, which she distributed to Drabinsky, Gottlieb, Topol, and Eckstein. NH SAC ¶ 118; RC ¶¶ 307-08. After these meetings, Winkfein, Malcolm and Fiorino made adjustments to various accounts in the balance sheet and income statement, including expense categories, specific shows and *401 fixed asset accounts. NH SAC ¶ 118; RC ¶ 309.
The amount and magnitude of the adjustments eventually grew to a point that it was not possible to make individual changes to Livent's general ledger. NH SAC ¶ 119; RC ¶ 314. Eckstein directed Malcolm to instruct Livent's information services department to write a computer program that would allow the accounting staff to override Livent's accounting system. NH SAC ¶ 119; RC ¶ 314. Livent's information services manager wrote computer programs to enable the accounting staff to execute adjustments on a batch basis. NH SAC ¶ 119; RC ¶ 314.
With respect to the transferral of expenses from one show to another, Livent's policy was to expense costs of cancelled shows at the time of cancellation, and it was well known when a particular show had ended its run. NH SAC ¶ 120. That no writedown was taken at the end of a show's run meant that Livent was not following its own accounting policy, a fact Plaintiffs allege D & T either knew or was reckless in failing to recognize. NH SAC ¶ 120. In Plaintiffs' theory, with respect to all of the accounting manipulations, the magnitude of the top-end adjustments was so great, and the existence of red flags so clear, that the misconduct should have been detected through independent confirmation procedures carried out in an audit conducted in accordance with Generally Accepted Auditing Standards ("GAAS"). NH SAC ¶ 120; RC ?57 363-68. Yet, D & T failed to examine necessary evidence to opine as to the appropriateness of Livent's accounting treatment of these transactions. NH SAC ¶ 120; RC ¶¶ 363-68.
The cumulative impact of these accounting irregularities caused Livent to materially understate expenses by approximately $3.5 million in fiscal 1995, $18 million in fiscal 1996, and $8.5 million in fiscal 1997, and to overstate expenses in the first quarter of 1998 by $2.7 million. NH SAC ¶ 112.

C. THE UNDISCLOSED KICKBACKS

Beginning in 1990 and continuing through 1994, Drabinsky and Gottlieb allegedly operated a kickback scheme with two Livent vendors. NH SAC ¶ 121; RC ¶ 329. Drabinsky and Gottlieb directed Eckstein to improperly capitalize the payments to the vendors, approximately $4 million, into preproduction costs. NH SAC ¶ 122. As a result, Livent's fiscal 1994, 1995 and 1996 financial statements, which reported preproduction costs of $28 million, $55.4 million and $75.6 million, respectively, were overstated by approximately $4 million in each year. NH SAC ¶ 122.

D. OTHER FRAUDULENT CONDUCT

1. Livent's Fraudulent Ticket Purchases

From September through December 1997, Livent senior management arranged for Peter Kofman ("Kofman") and Roy Wayment ("Wayment") (the two vendors involved in the kickback scheme described above) to purchase tickets for Livent's Los Angeles production of "Ragtime" in order to inflate ticket sales reported to Variety magazine. NH SAC ¶ 123; RC ¶¶ 337-38. This fraud was significant because if weekly ticket sales fell below $500,000.00, Livent's Los Angeles landlord, the Schubert Theater, could evict Livent pursuant to a clause in their lease. NH SAC ¶ 123; RC ¶ 339. Since Livent planned to open "Ragtime" on Broadway in January 1998, poor sales in Los Angeles would have undermined its planned opening, and an eviction would have been devastating. NH SAC ¶ 123; RC ¶¶ 339-40. For management, which was counting on "Ragtime" to turn the financial fortunes of Livent around, it *402 was imperative to portray the Los Angeles production of "Ragtime" as financially successful. NH SAC ¶ 123; RC ¶ 340.
From September 30, 1997 to December 31, 1997, Kofman purchased tickets totaling U.S. $381,015.00 from the box office at the Schubert Theater in Los Angeles. NH SAC ¶ 124; RC ¶ 337. Kofman made these purchases using his personal credit card or through personal checks or checks issued from one of his companies. NH SAC ¶ 124. Livent then reimbursed Kofman or his companies. NH SAC ¶ 124; RC ¶ 337. In November 1997, Eckstein also enlisted Wayment to purchase tickets to the Los Angeles production of "Ragtime". NH SAC ¶ 124; RC ¶¶ 338. Eckstein instructed Wayment to write checks to the Schubert Theater for tickets. NH SAC ¶ 124. Livent then reimbursed Wayment's construction company, Execway. NH SAC ¶ 124; RC ¶ 338.
Eckstein directed the Livent accounting staff to improperly capitalize these ticket purchases in Livent's fixed asset accounts. NH SAC ¶ 125; RC ¶ 341. As a result, Livent's fixed asset accounts were false and misleading. NH SAC ¶ 125; RC ¶ 341. Moreover, the box office numbers reported by Livent to Variety were materially false and misleading, designed to convey the false impression that "Ragtime" was a successful engagement in Los Angeles. NH SAC ¶ 125; RC ¶ 341.

2. Allegations Specific to Deloitte

According to Plaintiffs, Deloitte falsely represented that its audits of Livent's 1995, 1996, and 1997 financial statements had been conducted in accordance with GAAS and wrongfully issued "clean" or unqualified opinions or certifications that those financial statements fairly presented Livent's financial condition and results of operations in conformity with GAAP. NH SAC ¶ 204.
Plaintiffs also assert that when Deloitte examined Livent's 1997 expenses in 1998 by subsequent disbursements testing, it requested back-up data on a random sampling of accounts payable recorded in the first two months of 1998. NH SAC ¶ 206. Deloitte examined about $2 million of disbursements out of a total of about $10 million, and found that $500,000.00  or 25 percent  of the total, was improperly included in 1998. NH SAC ¶ 206. Deloitte, however, failed to examine sufficient evidentiary matter to certify that the amounts in their initial sample were the only expenses that should have been recorded in 1997, and to prepare them to properly test the 1998 expenses.
Deloitte allegedly requested documentation to support the sampling of Livent's expenses assigned to fixed asset accounts  approximately 60 entries. NH SAC ¶ 207. During this sampling, Livent concluded that the supporting documentation would have evinced fraudulent classification of construction costs. NH SAC ¶ 207. Rather than produce such evidence, Livent ignored the request for such "misclassifications" and produced only safe documents to support Deloitte's sampling, even in the face of continued requests by Deloitte. NH SAC ¶ 207. Deloitte ultimately relented and stopped its sampling. NH SAC ¶ 207.
Deloitte also allegedly disregarded Livent's manipulation of advertising expenses. NH SAC ¶ 208. Livent reduced expenses by manipulating the dates on invoices from advertising agencies. Livent would either request that advertising agencies hold invoices until after the end of a fiscal year, or simply alter the dates on invoices. Advertising invoices for print advertisements were maintained at Livent with the actual advertisements attached to the invoices. All full page advertisements contained the date of the newspaper in *403 which they were published. Livent did not alter the dates on the attached advertisements. Accordingly, Plaintiffs allege that discovering the conflicting dates between the advertisement and the invoice was in clear sight.
When Deloitte actually examined samples of Livent advertising invoices in 1995 and 1996, they examined only the top page of each invoice and neglected to match up the advertisement to the invoice. NH SAC ¶ 209. After Deloitte found evidence of fraudulent advertising invoices during the 1997 audit, it still failed to enlarge its review or sample as is was required under GAAP. NH SAC ¶ 209. All that Deloitte required was a reclassification of the fraudulent invoices in 1997. NH SAC ¶ 209.
Plaintiffs also allege that Deloitte failed to follow up on representation letters that it relied upon for its own defenses to malpractice. NH SAC ¶ 210. As part of the 1996 and 1997 audits, Deloitte requested that Livent provide a routine representation letter stating that they were aware of no material inaccuracies in the Livent financial statements. NH SAC ¶ 210. Messina refused to sign the representation letters drafted by Deloitte. NH SAC ¶ 210. In addition, Deloitte requested a separate representation letter, signed by Livent's General Counsel, Jerald Banks ("Banks"), stating that several of the revenue-generating transactions described above represented the entire agreement between the parties. NH SAC ¶ 210. Banks had never been asked to sign such a letter before, and added a paragraph to the 1996 letter to address the Pace transactions. NH SAC ¶ 210. He did not sign the letter, and Deloitte never followed up. NH SAC ¶ 210.
As part of the 1997 audit, according to Plaintiffs, Deloitte once again asked Banks to sign a "revenue generating transactions" letter. NH SAC ¶ 211. This time the letter included the paragraph Banks had added for the Pace contract, but did not qualify the many other similar transactions  most importantly the CIBC Wood Gundy agreement. NH SAC ¶ 211. Accordingly, Banks declined to sign the document and Deloitte never followed up. NH SAC ¶ 211. Instead, Messina had the contents of both letters redrafted, so that they became a single letter which could be signed by Gottlieb and Drabinsky. NH SAC ¶ 211.
Plaintiffs contend as well that the agreements to sell the production rights to shows such as "Show Boat" and "Ragtime" to third parties "made no financial sense to the purchasing parties", since these parties were apparently obligated to pay a nonrefundable fee even if Livent failed to make the shows available to them. NH SAC ¶ 233. Plaintiffs maintain that Deloitte should have investigated these transactions further. NH SAC ¶ 233. Further, they claim that the significance of the "Put" Agreement Deloitte found in connection with the Dundee transaction should have been thoroughly investigated but was not. NH SAC ¶ 233. In Plaintiffs' view, had Deloitte merely compared Livent's schedules of projected figures for preproduction costs, revenues, and fixed assets to subsequently prepared schedules showing actual figures for the fiscal year, and compared the current year's schedules of these figures for ongoing shows to the prior year's schedules, Deloitte would have seen that Livent did not write off unamortized costs for closed shows, did not properly amortize costs for ongoing shows and/or treated these costs as capital expenditures, and shifted pre-production costs from one show to another, all in violation of GAAP. NH SAC ¶ 233.

V. DISCUSSION
The disputes before the Court on defendants' various motions to dismiss Plaintiffs' *404 complaints raise two sets of issues. The first points in contention involve procedural questions regarding the proper application of Rules 12(b)(6), 9(b) and 8(e) of the Federal Rules of Civil Procedure. The second group of issues implicate the substantive standards that govern the application of the federal securities laws.

A. LEGAL STANDARDS: MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(6)

Among their challenges to the complaints, various defendants argue that the pleadings fail to state any claim upon which relief may be granted, or to allege circumstances constituting fraud with the particularity required by Fed.R.Civ.P. 9(b). Some defendants contend as well that a number of Plaintiffs' allegations are contradicted by other statements in the complaints and that averments of fraud under § 10(b) of the Exchange Act would bar inconsistent claims of negligent misrepresentations pursuant to §§ 11 and 12 of the Securities Act based on the same assertions of fact. Plaintiffs counter that the Rule 12(b)(6) standard of review requires the court to accept as true the facts alleged in the complaint and that, in accordance with Rule 8(e), Plaintiffs may state claims alternatively "regardless of consistency." Fed.R.Civ.P. 8(e). These disputes bring into play the interrelation of Rules 8(e), 9(b) and 12(b)(6).
On a motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted, the court must accept the well-pleaded factual allegations in the complaint as true. See Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir.1998). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.1985). The court need not credit conclusory statements unsupported by assertions of facts or legal conclusions and characterizations presented as factual allegations. See Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). The court must limit itself to facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference. See Dangler v. New York City Off Track Betting Corp., 193 F.3d 130, 138 (2d Cir.1999). However, the court may also consider documents that, while not explicitly incorporated into the complaint, are "integral" to plaintiff's claims and were relied upon in drafting the complaint. See Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 44 (2d Cir.1991).
Fed.R.Civ.P. 9(b) sets forth additional pleading standards with respect to allegations of fraud, including securities fraud. See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1127 (2d Cir.1994). Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The 1995 Reform Act heightened Rule 9(b)'s requirement for pleading scienter. See 15 U.S.C. § 78u-4(b)(3)(A); see also discussion infra Part V.B.3.; Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 537-38 (2d Cir.1999). As a result, in securities fraud actions, scienter may not be averred generally. Rather, plaintiffs must "`state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Press, 166 F.3d at 538 (quoting from the 1995 Reform Act, 15 U.S.C. § 78u-4(b)(3)(A)).
The issues here in dispute raise an incongruity in the application of Rule 12(b)(6) standards in actions for fraud. In *405 prefacing their consideration of motions to dismiss under Rule 12(b)(6), courts routinely repeat the doctrine that with regard to such motions the facts alleged in the complaint are presumed to be true and that all doubts and factual inferences are resolved in plaintiff's favor. Typically, as though articulating by rote, plaintiffs opposing defendants' motions to dismiss, as those in the instant case have done, invoke this test as their mantra, insisting that in assessing the motion the court is obligated to assume the truth of all allegations plaintiffs insert into the complaint.
The standard formulation of the Rule 12(b)(6) inquiry raises three questions which are implicated in the series of motions before the Court and which were also previously considered by Judge Sweet in his rulings on similar motions in dismissing the Shareholders' Action.
First, the court must determine what matters beyond the pleadings may be considered in connection with the motions. Various defendants rely on material outside the pleadings, such as the criminal indictments of and the SEC's civil complaint against Drabinsky, Gottlieb, and the other Livent officers.
The second issue is to what extent the pleadings in the complaint may be self-contradictory. In this connection, the Court notes that the formulaic test stating that, in connection a Rule 12(b)(6) motion to dismiss, all facts alleged in the complaint must be accepted as true, poses some conceptual difficulties that indicate a need for some qualification. As regards averments of fraud that must be stated with particularity under Rule 9(b), a complaint that contains inconsistent factual assertions challenges the court to decide how to treat the incongruity, in light of the provisions of Rule 8(e) that permit statements of a claim in the alternative and regardless of consistency. Pleadings, such as those put in contention here, stating both that plaintiffs had knowledge of a critical fact and that they had no such knowledge; or that plaintiffs had no awareness of specific information revealed in some particular document, while at the same time asserting that they relied upon the contents of that same document, pose just such a quandary. In ruling on the sufficiency of a unitary fraud theory whose essential elements turn on what facts plaintiffs knew and relied upon, and for the purposes of drawing reasonable inferences in plaintiff's favor, which of two conflicting factual statements does the court accept as true if one necessarily negates the other? See, e.g., National Western Life Ins. Co. v. Merrill Lynch Pierce, Fenner & Smith, Inc., 112 F.Supp.2d 292, 307 (S.D.N.Y. 2000).
Under the principles and policies underlying Rules 12(b)(6), 9(b) and 8(e) and case law applying them, the discrepancy noted above may be reconciled. As further refined, Rule 12(b)(6) motion practice does not demand that every allegation in the complaint must be deemed true, but only "factual" assertions. This test would exclude pleadings expressing legal conclusions, speculation and unsubstantiated allegations "so broad and conclusory as to be meaningless". Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 120 (2d Cir.1982); O'Brien v. National Prop. Analysts Partners, 936 F.2d 674, 676 (2d Cir.1991). In sum, the standard to govern the sufficiency of the complaint presumes "well-pleaded" allegations, and it is only those pleadings the courts are charged to deem true.
Thus, a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of *406 which the court may take judicial notice. See, e.g., Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1095 (2d Cir.1995) (sustaining dismissal of the complaint where "attenuated allegations" supporting a claim "are contradicted both by more specific allegations in the complaint and by facts of which [the court] may take judicial notice"); Chill v. General Elec. Co., 101 F.3d 263, 267 (2d Cir.1996) (plaintiffs do not have "license to base claims of fraud on speculation and conclusory allegations"); Salahuddin v. Jones, 992 F.2d 447, 449 (2d Cir.1993)(dismissing claim that is based on "wholly conclusory and inconsistent allegations"); Rapoport v. Asia Elecs. Holding Co., 88 F.Supp.2d 179, 184 (S.D.N.Y.2000) (granting motion to dismiss where the documents on which plaintiffs' securities fraud claim purport to rely contradict allegations in plaintiffs' complaint); American Centennial Ins. Co. v. Seguros La Republica, S.A., No. 91 Civ. 1235, 1996 WL 304436 at *16 (S.D.N.Y. June 5, 1996)("Allegations are not well pleaded if they are `made indefinite or erroneous by other allegations in the same complaint[, or] ... are contrary to facts of which the Court will take judicial notice.'") (quoting Trans World Airlines, Inc. v. Hughes, 449 F.2d 51, 63 (2d Cir.1971)); Maywalt v. Parker & Parsley Petroleum Co., 808 F.Supp. 1037, 1046 (S.D.N.Y.1992); see also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir.1997) ("[B]oilerplate and conclusory allegations will not suffice. Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible").
Finally, Rule 9(b), recognizing the adverse effects charges of fraud may have on a defendant's reputation, raises the bar on pleading. For these reasons, the Second Circuit requires that the heightened standards of Rule 9(b) are to be "rigorously enforce[d]". Ross v. Bolton, 904 F.2d 819, 823 (2d Cir.1990). To satisfy the requirement and defeat a motion to dismiss, "[a]n ample factual basis must be supplied to support the [fraud] charges." O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d Cir.1991).
The third question referred to relates to the meaning of the provisions of Rule 8(e)(2) that allow a complaint to incorporate alternative statements of a claim, as well as separate claims "regardless of consistency." Fed.R.Civ.P. 8(e)(2). When adopted, Rule 8(e)(2) was intended as a major departure from the perilous formalism of the past, which made fatal any missteps by plaintiffs pleading inconsistent claims. See Henry v. Daytop Village, Inc., 42 F.3d 89, 95 (2d Cir.1994) (citing 5 Charles A. Wright & Arthur Miller, Federal Practice and Procedure § 1282, at 533 (2d ed.1989)).
But this reform cannot be construed as an invitation to incoherent, self-contradictory pleadings. Rule 8(e) permits a plaintiff to make two or more "statements of a claim" alternatively. In that event, an alternative which standing independently would be sufficient to state a claim is not rendered insufficient by other alternatives which as pleaded may be insufficient. In addition, plaintiffs may state as many separate claims as they have regardless of consistency. See Fed. R.Civ.P. 8(e).
Two notable observations emerge from these provisions. First, in order for the alternative pleading allowance to apply, Rule 8(e) presumes the existence of at least one sufficient, independently asserted statement of a claim. Id. Accordingly, if no alternative claim sufficiently stands alone, the pleading flexibility the Rule extends is unavailing.
*407 Second, the Rule refers to statements of "separate claims" which are permitted "regardless of consistency". Fed.R.Civ.P. 8(e)(2). This reference also presumes that each unitary claim must be sufficient standing on its own. See National Western, 112 F.Supp.2d at 307. In other words, the factual pleadings in the complaint must be sufficient to state all the requisite elements of a given theory of liability even if the allegations may not suffice, or may be inconsistent with, the elements required to satisfy the requirements of, some other distinct basis for recovery plaintiff may also claim. That is not to say, however, that Rule 8(e) grants plaintiffs license to plead inconsistent assertions of facts within the allegations that serve as the factual predicates for an independent, unitary claim. See id. Internally conflicting factual assertions that constitute integral components of a claim must be distinguished from a permissible alternative statement embodying a theory of a whole sufficient claim. See id.
This distinction is especially pertinent in cases alleging fraud because particular information plaintiffs themselves knew and relied upon in drafting their pleadings may be an essential element of a statement of a sufficient claim, and because, in connection with pleadings the court on a motion to dismiss is to presume true, only plaintiffs are in a position to assert the state of their awareness and reliance as regards facts vital to their case. In this connection Rule 8(e)(2) could not coherently contemplate that plaintiffs pressing a claim of fraud would be allowed to make a factual assertion in one paragraph of the complaint declaring that they were not aware of some material information, and in another part of the same claim concede that they relied detrimentally upon that same factual representation as the basis for recovery. Under these circumstances, such conflicting allegations would be deemed admissions that undermine plaintiffs' statement of the elements of a sufficient claim. See Burlington, 114 F.3d at 1418; Trans World Airlines, 449 F.2d at 63.
Here, as discussed below in the consideration of Plaintiffs' specific allegations, the Court finds certain procedural deficiencies in the complaints that support defendants' motions to dismiss. In some respects the allegations of fraud are internally self-contradictory, and the inconsistencies defeat a reasonable inference that the requisite scienter standard the pleadings must demonstrate has been satisfied. On the other hand, the Court concludes that while particular conflicting allegations may render statement of an Exchange Act § 10(b) fraud theory insufficient, in accordance with Rule 8(e) the pleadings nonetheless may be sufficient to assert claims for relief pursuant to alternate bases of liability under Securities Act §§ 11 or 12, to the extent the elements necessary to make out a case under those other theories are sufficiently pleaded.

B. THE SECURITIES LAWS

Plaintiffs contend that the actions and omissions of the various defendants involved in the Livent transactions described above, and in Livent's resulting downfall, violate provisions of both the Securities Act and the Exchange Act. Specifically they argue that, given the magnitude and duration of the Livent Inside Directors' frauds, the supporting roles the Outside Directors, auditors, bankers and securities sellers played in causing or not discovering the misconduct sooner, rendered them sufficiently culpable to fall within the scope of the statutes. Thus, Plaintiffs assert that the various defendants' involvement may be held to evidence fraudulent intent or recklessness for the purposes of recovery under § 10(b) or "control person" liability *408 under § 20(a) of the Exchange Act. Plaintiffs argue that, in addition or in the alternative, defendants' participation in the events at issue was sufficient to constitute violations under the thresholds applicable to §§ 11, 12(a)(2) and 15 of the Securities Act.
Defendants counter that the complaints do not plead facts with the particularity required to support a strong inference of fraud, and are therefore insufficient under Fed.R.Civ.P. 9(b) and the heightened pleading standards imposed by the PSLRA. In any event, according to defendants, Plaintiffs' claims are insufficient to make out the elements required for liability under the various statutes and theories of recovery Plaintiffs invoke.
Resolution of these disputes requires a review of the statutory framework embodied in the Securities and Exchange Acts, and the effects of the PSLRA.

1. THE 1933 SECURITIES ACT

a. Section 11

Section 11 of the Securities Act, 15 U.S.C. § 77k, imposes liability on issuers of securities and their officers and directors when companies offering their shares to the public fail to provide required information, or include misleading statements, in their registration statements.
In case any part of the registration statement ... contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security [may] sue (1) every person who signed such registration statement [or] (2) every person who was a director of ... the issuer at the time of the filing ....
15 U.S.C. § 77k.
Section 11 "places a relatively minimal burden on a plaintiff," requiring simply that the plaintiff allege that he purchased the security and that the registration statement contains false or misleading statements concerning a material fact. Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). An omission is "material" if there is a substantial likelihood that the "disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the `total mix' of the information made available." Steinberg v. PRT Group, Inc., 88 F.Supp.2d 294, 300 (S.D.N.Y.2000) (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Put differently, a § 11 claim may not properly be dismissed pursuant to Rule 12(b)(6) on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance. See Steinberg, 88 F.Supp.2d at 300. Because materiality is generally a question of fact, it is unlikely that a cause of action turning on materiality would be dismissed as a matter of law. See Feiner v. SS & C Technologies, 11 F.Supp.2d 204, 208 (D.Conn.1998).
A § 11 plaintiff does not need to establish a defendant's scienter, or even negligence. See Huddleston, 459 U.S. at 382, 103 S.Ct. 683. It is enough if the registration statement is shown to have contained material misstatements or omissions. However, all defendants except the issuer may escape liability by establishing certain defenses, among which is a showing of reasonable grounds for belief in the *409 truth of the registration statement. See 15 U.S.C. § 77k(b)(3).
Additionally, § 27A(c) of the Securities Act, added by the PSLRA, allows an exception to the absence of scienter from § 11 liability. It provides that no liability will attach in a private action based on certain statutorily defined "forward looking statements" unless the plaintiff proves actual knowledge of the false or misleading nature of the statement on the part of a natural person making the statement or on the part of an executive officer approving the statement made on behalf of a business entity. See 15 U.S.C. § 77z-2(c)(1)(B)(i).

b. Section 12(a)(2)

Section 12(a)(2) imposes liability on certain sellers of securities. Any person who by use of any means of interstate commerce offers or sells a security on the basis of a materially false or misleading prospectus or materially false or misleading oral statements is liable to the person purchasing from him unless he can show that he did not know, and could not in the exercise of reasonable care have known of the falsehood or omission. As with § 11, there is no requirement under § 12(a)(2) that a plaintiff show scienter or negligence except as required under § 27A(c).
A § 11 or § 12 plaintiff need not show that he relied on statements in a registration statement or prospectus to recover, but he may not recover under either § 11 or § 12(a)(2) if he knew of the Registration Statement's or Prospectus's untruth or omission at the time of purchase.

c. Section 15

Section 15 of the 1933 Act, as amended by § 208 of Title II of the 1934 Act, provides that persons who "control" any person subject to liability under §§ 11 or 12 may also be liable jointly and severally to the same extent as the controlled person, unless he "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o.

2. The Securities Exchange Act

a. Section 10(b) and SEC Rule 10b-5

Section 10(b) of the Exchange Act provides in pertinent part that:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j(b).
Rule 10b-5 "more specifically delineates what constitutes a manipulative or deceptive device or contrivance." Press, 166 F.3d at 534. Under Rule 10b-5,
[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or *410 deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b-5 (1999).
To state a claim for relief under § 10(b) and Rule 10b-5, plaintiffs must allege that each defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." In re IBM Corp. Sec. Litig., 163 F.3d 102, 106 (2d Cir.1998).
The Securities Act proscribes false or misleading representations in registration statements and prospectuses by issuers and sellers of securities, but allows an affirmative defense that the seller acted in good faith, having conducted satisfactory due diligence or relied upon the opinions of professionals.
The Exchange Act enlarged the scope of liability for violations of the securities laws in some ways. It encompassed the wrongful acts not only of issuers and sellers and their principals but a wider range of actors: not just the corporation's officers, managers and directors, as well as the underwriters, but the accountants and other professional service providers who typically play substantial roles in the preparation of documents upon which securities transactions and their ongoing value depend.
At the same time, in defining liability under § 10(b), Congress made the standard narrower and stricter. Its measure of culpability, while not expressly stated in the form of conduct Rule 10b-5 proscribes, has been limited to behavior demonstrating scienter. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In Hochfelder, the Supreme Court, holding that a private cause of action under § 10(b) and Rule 10b-5 cannot be maintained without any allegation of scienter, defined the term as "a mental state embracing intent to deceive, manipulate or defraud". Id. at 194, n. 12, 96 S.Ct. 1375. This requirement derives from analogy of Rule 10b-5 deception to the common law action for fraud, the elements of which mandate a showing of scienter. See id. at 197, 96 S.Ct. 1375; see generally W. Page Keeton, et al., Prosser and Keeton on Torts § 107 (5th ed.1984) (herein "Prosser").
In enunciating the scienter standard, the Hochfelder Court did not address some questions regarding how far the continuum of § 10(b) culpability extended. Among the issues left unresolved were some which have arisen in the case now before this Court: the applicability of Rule 10b-5 to actions brought against alleged aiders and abettors of securities violations and whether the scienter requirement can be satisfied by a showing of conduct which does not demonstrate actual knowledge or intent but which is alleged to be reckless. The aider and abettor question was settled by the Supreme Court in Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), where the Court ruled that no such right of action exists under § 10(b).
The issue of recklessness as a measure of scienter, absent a clear mandate from the Supreme Court, has remained guided by doctrine developed by Circuit Court case law. Similarly extending common law principles governing the action for deceit, the lower courts generally have imposed on Rule 10b-5 actions a requirement that plaintiffs plead facts tending to demonstrate that defendants' conduct entailed reckless disregard for the truth or the utterance of a statement or omission known to be untrue. See generally 2 Thomas Lee Hazen, The Law of Securities *411 Regulation § 13.4 at 498 (3d ed.1995) (herein "Hazen") (citing cases).
The Second Circuit Court of Appeals, even prior to Hochfelder, had advanced the proposition that a scienter standard which mirrored the common law formulation was a prerequisite for liability in Rule 10b-5 actions. See Lanza v. Drexel & Co., 479 F.2d 1277, 1301 (2d Cir.1973) (en banc) ("Other cases in this circuit clearly indicate that `facts amounting to scienter, intent to defraud, reckless disregard for the truth, or knowing use of a device, scheme or artifice to defraud are essential to the imposition of liability'") (quoting Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2d Cir.1971)). The Circuit Court, in later specifically holding that reckless conduct could suffice to satisfy the scienter requirement under § 10(b) and Rule 10b-5, defined the term as:
at the least, conduct which is "highly unreasonable" and which represents an extreme departure from the standards of ordinary cases ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.[5]
Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F.2d 38, 47 (2d Cir.1978) (quoting Sanders v. John Nuveen & Co., 554 F.2d 790, 793 (7th Cir.1977)) (ellipsis in original); see also Chill v. General Elec. Co., 101 F.3d 263, 269 (2d Cir.1996) (noting that in some cases "[a]n egregious refusal to see the obvious, or to investigate the doubtful" may give rise to an inference of recklessness) (quoting Goldman v. McMahan, Brafman, Morgan & Co., 706 F.Supp. 256, 259 (S.D.N.Y.1989)).
The concept of recklessness necessarily introduces imprecision and matters of degree into measures of culpability in actions brought under Rule 10b-5. See Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir.2000) ("Recklessness is harder to identify with such precision and consistency.") Recognizing that the term eludes more precise articulation and defies categorical tests, courts which have struggled with its formulation and application have essayed only that a finding of recklessness demands conduct that exceeds negligence but does not cross the threshold of intentional mis-conduct. See Sanders, 554 F.2d at 793 ("We believe `reckless' in these circumstances comes closer to being a lesser form of intent than merely a greater degree of ordinary negligence. We perceive it to be not just a difference in degree, but also in kind.").
What the term encompasses has been variously portrayed as an approximation that borders on actual intent, or, as characterized by the Seventh Circuit, as "the functional equivalent of intent." Sundstrand, 553 F.2d at 1045; see also Decker, 681 F.2d at 120-21 (Reckless conduct "must, in fact, approximate an actual intent to aid in the fraud being perpetrated..."); In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 550 (6th Cir.1999) (describing recklessness as being "apart from negligence and akin to conscious disregard"). Accordingly, as the Sundstrand standard explicitly mandates, simple or even inexcusable negligence will not suffice to satisfy the § 10(b) scienter requirement. See Sundstrand, 553 F.2d at 1044-45; National *412 Union Fire Ins. Co. v. Wilkins-Lowe & Co., 29 F.3d 337 (7th Cir.1994); see also Hazen § 13.4 at 499 ("It is clear that in order to establish scienter, the defendant must have had more than a tangential connection to both the transactions and the statements under scrutiny.")
Further elaboration on what conduct may suffice to state a securities claim alleging recklessness was recently supplied by the Second Circuit in Novak. The Court of Appeals there surveyed its prior decisions articulating the circumstances it had upheld as sufficient to plead scienter in securities fraud cases. See Novak, 216 F.3d at 307-08 (citing cases). Specifically, the court identified standards requiring allegations of facts demonstrating that defendants: (1) benefitted in some concrete and personal way from the fraudulent conduct plaintiffs asserted, or (2) engaged in intentional misconduct (easily defined as deliberate illegal behavior) or recklessness. See id.
Turning to recklessness, the Court of Appeals acknowledged that the various general standards propounded by the courts "offer little insight into precisely what actions and behaviors constitute recklessness sufficient for § 10(b) liability." Novak, 216 F.3d at 308. For concrete guidance the Circuit Court instead referred in the first instance and by way of example to the "actual facts" of the Circuit's securities fraud cases decided prior to the enactment of the 1995 Reform Act. The court specifically highlighted cases entailing allegations of facts demonstrating that defendants:(1)possessed knowledge of facts or access to information contradicting their public statements (citing Cosmas v. Hassett, 886 F.2d 8, 12 (2d Cir.1989)); Goldman v. Belden, 754 F.2d 1059, 1063 (2d Cir.1985); or (2) "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud". Novak, 216 F.3d at 308 (citing Rolf, 570 F.2d at 47-48; SEC v. McNulty, 137 F.3d 732, 741 (2d Cir.1998)).
The Circuit Court cautioned, however, that its jurisprudence concerning securities fraud based on reckless conduct encompasses certain important limitations on the scope of liability. First, the court has refused to allow plaintiffs to proceed with allegations of "fraud by hindsight." Novak, 216 F.3d at 309 (citing Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir.1999); Denny v. Barber, 576 F.2d 465, 470 (2d Cir.1978); Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir.1995) (allegations that defendants should have anticipated future events and made earlier disclosures did not suffice to make out a claim of fraud)).
Second, the court noted cases holding that corporate managers are not obligated to portray their business' performance and prospects in unduly cautious or gloomy terms in public pronouncements, so long as their representations are consistent with reasonably available data. See Novak, 216 F.3d at 309 (citing Stevelman, 174 F.3d at 85; Shields v. Citytrust Bancorp, Inc. 25 F.3d 1124, 1129-30 (2d Cir.1994)).
Third, the court recognized that it had established limits on the scope of liability for failure to monitor alleged fraudulent conduct of third persons. See Novak, 216 F.3d at 309. Relevant to the facts in the case now before this Court, the Second Circuit specifically observed that "the failure of a non-fiduciary accounting firm to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability." Id. (citing Decker, 681 F.2d at 120; Chill, 101 F.3d at 269-70) (the failure of a parent company to regard the extraordinary profitability of its subsidiary's particular form of trading as signaling problems compelling *413 further investigation does not constitute adequate grounds for a finding of recklessness sufficient for liability under § 10(b)).
Finally, and also particularly pertinent to the case at hand, the Court of Appeals referred to its prior rulings that allegations of GAAP violations or accounting irregularities, standing alone, do not suffice to state a securities fraud claim. See Novak, 216 F.3d at 309 (citing Stevelman, 174 F.3d at 84; Chill, 101 F.3d at 270). In this connection, such allegations may be sufficient only when coupled with evidence of "corresponding fraudulent intent". See Novak, 216 F.3d at 309 (quoting Chill, 101 F.3d at 270).
This analytic framework reflects the Supreme Court's interpretation of Congressional intent embodied in § 10(b). In several rulings demarcating the bounds of the conduct to which the statutory scheme of § 10(b) extends, the Supreme Court could not be more emphatic in stressing that Congress manifested a purpose to draw the line at knowing, intentional or extreme behavior, and to distinguish fraudulent actions from lesser wrongs. In Hochfelder, the Supreme Court stressed that in choosing the words "manipulative or deceptive device or contrivance," Congress did not intend the prohibition of § 10(b) to encompass alleged violations that constitute mere negligence. See Hochfelder, 425 U.S. at 197, 96 S.Ct. 1375. Based on similar reasoning, the Court held in Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), that § 10(b) did not reach breaches of fiduciary duties by majority shareholders where there was no showing of conduct involving manipulation or deception. The principle was reinforced in Chiarella v. United States, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), where the Supreme Court determined that § 10(b) is not violated when a trader transacts in securities without disclosing inside information which he had no independent duty to disclose. Most recently, in Central Bank of Denver, 511 U.S. at 177, 114 S.Ct. 1439, the Supreme Court, overturning 25 years of Circuit Court precedents to the contrary, ruled that the 1934 Act does not establish a cause of action of aiding and abetting a § 10(b) securities violation.
Articulating its reading of the will of Congress, the Supreme Court has reaffirmed and underscored in these cases that § 10(b) was designed to capture the higher grade of wrongful conduct associated with conscious or egregious actions, incorporating within the contours of the statute a standard of culpability that reflects not just matters of shades or degrees, but of fundamental substance. As the Supreme Court noted, "not every instance of financial unfairness constitutes fraudulent activity under § 10(b)." Chiarella, 445 U.S. at 232, 100 S.Ct. 1108. Thus, while § 10(b) has been described and may have been contemplated as a "catchall" provision, "what it catches must be fraud." Id. at 234-35, 100 S.Ct. 1108.

b. Section 20(a)

Section 20(a) of the 1934 Act states that
[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
15 U.S.C. § 78t(a).
Courts within the Second Circuit have been divided on whether a complaint must *414 contain pleadings of scienter or culpable participation for a plaintiff to state a claim for § 20(a) liability. In Marbury Management, Inc. v. Kohn, 629 F.2d 705, 716 (2d Cir.1980), the Second Circuit, ruling that respondeat superior theory of liability is not precluded by § 20(a), remarked that
[w]hile the precise standard of supervision required of broker-dealers to make good the good faith defense of section 20(a) is uncertain, where, as in the present case, the erring salesman completes the transactions through the employing brokerage house and the brokerage house receives a commission on the transactions, the burden of proving good faith is shifted to the brokerage house, and requires it to show at least that it has not been negligent in supervision, and that it has maintained and enforced a reasonable and proper system of supervision and internal control over sales personnel.
Many district courts have focused on this language in holding that neither scienter nor culpable participation are required to make out a prima facie case of control person liability  rather, all that is required is an allegation of control status. See, e.g., Borden v. Spoor Behrins Campbell & Young, Inc., 735 F.Supp. 587, 588 (S.D.N.Y.1990) (ruling that question has been "resolved authoritatively"); In re CitiSource, Inc. Sec. Litig., 694 F.Supp. 1069, 1076 (S.D.N.Y.1988) (stating that "it has long been held that once a defendant has been shown to be a controlling person, the burden shifts to that defendant to establish his good faith"); Polycast Technology Corp. v. Uniroyal, No. 87 Civ. 3297, Fed. Sec. L. Rep. (CCH) ¶ 94,005, 1988 WL 96586, *7 (S.D.N.Y. Aug.31, 1988) (same); Terra Resources I v. Burgin, 664 F.Supp. 82, 88 (S.D.N.Y.1987) (same); Savino v. E.F. Hutton & Co., 507 F.Supp. 1225, 1243 (S.D.N.Y.1981) (same).
A separate line of cases, relying on the Second Circuit's decisions in Lanza v. Drexel & Co., 479 F.2d 1277 (2d Cir.1973) and Gordon v. Burr, 506 F.2d 1080 (2d Cir.1974), requires the pleading of something more than control status to sustain a § 20(a) claim. The Circuit Court in Lanza remarked that "[t]he intent of Congress in adding [§ 20(a)] ... was obviously to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." Id. at 1299. Citing this language, many district courts have thus reasoned that the plaintiff must plead culpability as part of the prima facie case. See, e.g., Morse v. Weingarten, 777 F.Supp. 312, 318 (S.D.N.Y.1991) (requiring plaintiff to plead defendant's knowledge of primary violation); In re Par Pharmaceutical, Inc. Sec. Litig., 733 F.Supp. 668, 679 (S.D.N.Y.1990) (plaintiffs must allege that defendants were "in some meaningful sense culpable participants in the fraud perpetrated by controlled persons"); Bernstein v. Crazy Eddie, Inc., 702 F.Supp. 962, 979 (E.D.N.Y.1988) (requiring plaintiff to plead defendant's knowledge), vacated in part on other grounds sub nom. In re Crazy Eddie Sec. Litig., 714 F.Supp. 1285 (E.D.N.Y.1989); Harrison v. Enventure Capital Group, Inc., 666 F.Supp. 473, 478 (W.D.N.Y.1987) (culpable participation must be alleged).[6]
*415 More recently, the Second Circuit articulated the applicable standard relevant to § 20(a) liability. However, without acknowledging or otherwise addressing the rift among the district courts, the Court of Appeals in fact added fuel to the debate. In S.E.C. v. First Jersey, 101 F.3d 1450, 1472 (2d Cir.1996), the court, citing Lanza, stated that "in order to establish a prima facie case of controlling-person liability, a plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, ... and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." Relying on First Jersey, some courts, without elaboration, have required the plaintiff to plead culpable participation as an element of a § 20(a) claim  the position adopted by Judge Sweet in dismissing the § 20(a) claim in the related Livent Shareholders' Action. See Shareholders I, 78 F.Supp.2d at 221. Indeed, the courts may have concluded that the circuit definitively resolved the intra-circuit split in First Jersey by holding that a plaintiff must plead culpable participation.
But further inquiry may be indicated. As noted by Judge Preska in Mishkin v. Ageloff, No. 97 Civ. 2690, 1998 WL 651065, *7 (S.D.N.Y. Sept.23, 1998), "although the [circuit] court does indeed refer to the elements of a prima facie case, First Jersey was not a pleading case  it was an appeal from a final judgment after a bench trial.... This distinction between procedural postures is critical." In addition, First Jersey does not address any of the district court decisions that manifest the split. It seems unlikely that the circuit court would resolve this pleading issue in a case where the pleading standard was not directly before it, without announcing its intention to do so, and without mentioning a single district court case which discusses the division. See id.
Cause for additional scrutiny is suggested by an ambiguity that First Jersey raised and left unanswered. While stating that a showing of culpable participation is an element necessary to state a prima facie case, the court also adhered to and applied the Marbury Management standard, shifting the burden of proving good faith to the defendant and requiring it to show that it acted properly. See First Jersey, 101 F.3d at 1472-73.
The incongruity inherent in these conflicting standards has been noted by other courts. Judge Sweet has observed that "[d]espite the circuit court's apparent holding in First Jersey that both controlling person status and a person's culpable participation are part of the prima facie case, the court went on to state that `there can be no question that [the defendant] was a controlling person.... Hence, in order to escape controlling-person liability, [he] had the burden [to establish good faith].'" Dietrich v. Bauer, 126 F.Supp.2d 759, 766 n. 4 (S.D.N.Y.2001) (quoting First Jersey, 101 F.3d at 1473). This shift in the burden of proof "seem[s] to elide the culpable participation element" of the prima *416 facie case. Id. at 764. If "good faith and lack of participation are affirmative defenses, ... requiring them as part of the plaintiff's prima facie case ... confuses the parties' responsibilities." G.A. Thompson & Co. v. Partridge, 636 F.2d 945, 959 (5th Cir.1981); accord Metge v. Baehler, 577 F.Supp. 810, 816 (S.D.Iowa 1984) ("culpability and good faith are two sides of the same issue"), aff'd in pertinent part, 762 F.2d 621 (8th Cir.1985). In other words, requiring the plaintiff to plead culpability, at the same time requiring the defendant to prove good faith at trial, engenders an awkward allocation of pleading and proof whereby both parties bear burdens on the same issue.
Nevertheless, just as Judge Preska expressed in Mishkin, this Court cannot ignore the import of First Jersey, especially in light of the Second Circuit's subsequent affirmations of the same standard. Nothing precludes such a burden-shifting scheme, and however unusual it may be to require the plaintiff to plead an element that, at trial, the defendant bears the burden to disprove, reading First Jersey this way reconciles the apparent inconsistency.
The Second Circuit has recently restated First Jersey's formulation of the rule, though again in contexts that leave some doubt as to its binding effect. In Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir.1998), the court routinely laid out the First Jersey elements. Id. ("In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation.")(internal quotation marks omitted). What constitutes sufficient pleadings for a § 20(a) claim, however, was not before the court. In Boguslavsky, the Second Circuit simply decided that plaintiff's § 20(a) claim was not collaterally estopped.
Most recently, in Ganino v. Citizens Utilities Co., 228 F.3d 154, 170 (2d Cir. 2000), the Circuit reversed the district court's dismissal of a § 10(b) claim at the pleading stage, and then, seemingly in passing, iterated the First Jersey rule and concomitantly reversed the dismissal of the derivative § 20(a) claim, which the district court had dismissed for failure to plead primary liability of the controlled person. The culpability of the controlling person and the pleading standard to state a claim under § 20(a) were not at issue in Ganino.
In Mishkin, Judge Preska ultimately determined that despite First Jersey's laconic treatment of the issue, its statement of the rule cannot be overlooked. 1998 WL 651065 at *24. This conclusion is sound, particularly in light of the Circuit Court's recapitulations of the test in Boguslavsky and Ganino. This outcome also comports with the general intent of the 1995 Reform Act. As discussed below, Congress intended the PSLRA to make it "substantively harder for plaintiffs to bring securities fraud cases." Greebel v. FTP Software, 194 F.3d 185, 196 n. 9 (1st Cir.1999); see also, discussion infra Part V.B.3. While this Court would wish clearer guidance, until the Court of Appeals addresses the issue more explicitly, it seems that the authority available balances toward holding that the plaintiff bears the burden of pleading culpability as part of a prima facie case under § 20(a). The Court now turns to the standard of culpability the plaintiff must plead.
In Hochfelder, the Supreme Court held that scienter is a necessary pleading element of § 10(b) actions. The Court reasoned in part that Congress's use of the words "manipulative or deceptive device or *417 contrivance" in the language of § 10(b) "strongly suggest[s] that § 10(b) was intended to proscribe knowing or intentional misconduct." Hochfelder, 425 U.S. at 197, 96 S.Ct. 1375. Especially pertinent to the discussion here is the Court's statement that "each of the provisions of the 1934 Act that expressly create civil liability, except those directed to specific classes of individuals ... contains a state-of-mind condition requiring something more than negligence." Id. at 209, n. 8, 96 S.Ct. 1375. The Supreme Court then explicitly cited § 20(a) as an example of these "state-of-mind" provisions. Id.
While Hochfelder makes clear that a § 20(a) plaintiff must allege facts suggesting that the defendant's conduct exceeded that of mere negligence, there is some disagreement within this Circuit about what standard beyond negligence is required. In Mishkin, the court determined that the culpability standards under § 20(a) and § 10(b) are symmetrical. See 1998 WL 651065 at *25. Judge Preska concluded that there was "no good reason to apply one strong inference standard to § 10(b) claims and another strong inference standard to § 20(a) claims." Thus, because the plaintiff was required to plead particularized facts of the defendant's conscious misbehavior under § 10(b), the same requirement existed for the § 20(a) claim.
Other courts in this district have not followed the exacting culpability standard employed in Mishkin. For instance, in Gabriel Capital, L.P. v. NatWest Finance, Inc., 122 F.Supp.2d 407, 428 (S.D.N.Y.2000), Judge Scheindlin did not quarrel with the symmetry standard proffered in Mishkin, but did note that Mishkin "applied only a portion of [the § 10(b)] standard" because recklessness, and not just intent, is encompassed within § 10(b). Id. at 428. The Gabriel Capital court stated that "recklessness adds an important dimension to the § 10(b) analysis, because it allows a plaintiff to plead that the defendant knew or should have known that it was misrepresenting material facts." Id. Therefore, by finding recklessness infused in the § 20(a) culpability standard, Judge Scheindlin ruled that the plaintiffs had satisfied their burden by pleading particularized facts that the alleged controlling defendant "knew or should have known that [the primary violator] was engaging in fraudulent conduct..." Id. at 429.
Without specifically stating that § 20(a) plaintiffs may plead recklessness, as opposed to conscious misbehavior or actual fraudulent intent, to satisfy their burden of showing culpability, rulings of other courts in this Circuit support the proposition. In In re Twinlab Corp. Sec. Litig., 103 F.Supp.2d 193, 208 (E.D.N.Y.2000), the court dismissed the plaintiffs' § 20(a) claim despite the complaint's allegations that the defendants had access to financial statements and the capacity to prevent their fraudulent issuance. To survive the motion to dismiss, the plaintiffs further needed to allege "facts demonstrating that [the defendants] culpably participated in the scheme, rather than, for example, unknowingly approving credible but fraudulent financial reports prepared by subordinates." Id. Similarly, in Ruskin v. TIG Holdings, Inc., 98 CIV. 1068, 2000 WL 1154278, at *7, (S.D.N.Y. Aug.14, 2000), the court held that the plaintiffs' complaint was sufficient because it alleged facts showing that the defendant "knew or should have known" of the fraudulence of the information disseminated.
This Court is persuaded that recklessness is the appropriate minimum standard of culpability that plaintiffs must plead under § 20(a). This result reflects the *418 purposes and spirit of the 1995 Reform Act. See discussion infra Part V.B.3.

3. The 1995 Reform Act

a. Pleading Standards

Congress enacted the PSLRA in response to concerns about perceived abuses of private class actions in securities fraud litigation. In particular, Congress sought to deter strike suits of dubious merit filed for their vexation value, or as instruments intended to extract large settlements through unfounded assertions of fraud against any person associated with corporate bad news which causes the price of an issuer's stock to drop significantly. See Novak, 216 F.3d at 306.[7]
To these ends, the PSLRA enacted a number of amendments to the 1933 and 1934 Acts that come into play in the case at bar. Section 21D(b)(1) requires that in connection with any private action arising under the statute in which plaintiffs allege to have been misled by defendants' untrue statements or omissions of material fact
the complaint shall specify each statement alleged to have been misleading, the reasons or reasons why statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
15 U.S.C. § 78u-4(b)(1) (herein "Subsection (b)(1)"). Section 21D (b)(2) mandates that in actions under the statute
in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.
15 U.S.C. § 78u-4(b)(2) (herein "Subsection (b)(2)"). Section 21D(b)(3)(A) mandates that the courts dismiss complaints which fail to satisfy the pleading standards promulgated in Subsections (b)(1) and (b)(2). See 15 U.S.C. § 78u-4(b)(3)(A) (herein "Subsection (b)(3)(A)"). And Section 21D(b)(3)(B) directs the courts in § 10(b) actions to impose a stay on all discovery during the pendency of any motion to dismiss. See 15 U.S.C. § 78u-4(b)(3)(B) (herein "Subsection (b)(3)(B)").
Two important issues emerge from the adoption of the PSLRA critical to the resolution of motions before this Court: the statute's effect on the pleading standards of scienter and on the particularity required in Plaintiffs' pleadings detailing the circumstances constituting securities fraud. As a threshold matter, and as courts which have previously examined the question have concluded, the PSLRA addresses the pleading requirements governing securities litigation, and not the existing substantive standards and understanding of "scienter" as defined in settled case law. See In re Advanta Corp. Sec. *419 Litig., 180 F.3d 525, 534 (3d Cir.1999) (Subsection (b)(2) "was intended to modify procedural requirements while leaving substantive law undisturbed"); In re Baesa Sec. Litig., 969 F.Supp. 238 (S.D.N.Y. 1997) (the PSLRA did not raise the scienter requirement to demand more than recklessness); see also Joint Explanatory Statement of the Committee of Conference, S. Res. 1260, 104th Cong.2d Sess., Cong. Rec. H0774, H10775 (Daily Ed. Oct. 13, 1998) (in enacting the PSLRA Congress "did not intend to alter the standards of liability under the Exchange Act."); Hazen § 13.4 at 127 (2000 Pocket Part). But see In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 974, 979 (9th Cir.1999) (Congress intended the PSLRA to elevate the pleading standard beyond simple recklessness, requiring plaintiffs to allege facts indicating "deliberate recklessness"  a degree of misconduct "that strongly suggests actual intent").
The PSLRA, however, has occasioned spirited debate and sharp divisions among the courts with regard to interpretation of its pleading prerequisites, in particular those required by Subsection (b)(2). See Novak, 216 F.3d at 309-10. On the surface, the split centers on the extent to which Congress intended the 1995 Reform Act to strengthen existing pleading requirements in securities litigation. One of the central points at issue in this aspect of the debate is the Second Circuit's pre-PSLRA standard.
The Second Circuit's securities fraud pleading test, applied to determinations of the sufficiency of the complaint in § 10(b) cases, required plaintiffs to allege facts "that give rise to a strong inference of fraudulent intent." Acito, 47 F.3d at 52. The "strong inference" requirement could be fulfilled by either of two ways: alleging facts that (a) show defendants had "both motive and opportunity to commit fraud", or (b) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id. (quoting Shields, 25 F.3d at 1128).
The point of disagreement among the courts turns on the "motive and opportunity" prong of the Second Circuit's test, a standard which, standing alone, has been viewed as less rigorous than that of intentional misconduct or recklessness. A number of courts have adopted the view that Congress intended the PSLRA to enhance pleading requirements in securities cases, and thus that allegations of motive and opportunity with nothing more would not create an inference of scienter sufficiently strong to satisfy the enhanced pleading stringency the PSLRA mandated to state a claim under § 10(b). See Silicon Graphics, 183 F.3d at 979 (adopting a pleading standard requiring facts demonstrating "deliberate or conscious recklessness"); Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282-86 (11th Cir.1999) (holding that the PSLRA particularity requirement compels plaintiffs to allege "severe recklessness"); Comshare, 183 F.3d at 550 (equating recklessness to being "akin to conscious disregard", concluded that plaintiffs may survive a motion to dismiss by pleading facts that give rise to a strong inference of recklessness); Greebel, 194 F.3d at 195-96 ("[I]nferences of scienter survive a motion to dismiss only if they are both reasonable and `strong inferences.'"); In re Glenayre Technologies, Inc. Sec. Litig., 982 F.Supp. 294 (S.D.N.Y.1997); Baesa, 969 F.Supp. at 238.
A contrary view, citing legislative history and the use of the "strong inference" language derived from Second Circuit case law, holds that the PSLRA effectively imported the Second Circuit's test in its entirety, enabling plaintiffs to satisfy the inference of scienter with sufficient allegations of facts showing either motive and *420 opportunity, or a strong demonstration of intentional misconduct or recklessness. See Advanta, 180 F.3d at 534 ("[u]se of the Second Circuit's language compels the conclusion that the Reform Act establishes a pleading standard approximately equal in stringency to that of the Second Circuit"); Press, 166 F.3d at 537-38[8]; Dietrich v. Bauer, 76 F.Supp.2d 312 (S.D.N.Y.1999); Rubinstein v. Skyteller, Inc., 48 F.Supp.2d 315, 320 (S.D.N.Y. 1999); see also S.Rep. No. 104-98, at 15 (1995), U.S.Code Cong. & Admin.News 1995, at pp. 679, 694 (indicating that the Conference Committee intended to reinforce the requirements for pleading scienter in securities litigation and adopted "a uniform standard modeled upon the pleading standard of the Second Circuit"). But see Greebel, 194 F.3d at 195 ("the words of the Act neither mandate nor prohibit the use of any particular method to establish an inference of scienter."); Silicon Graphics, 183 F.3d at 974 (concluding that "Congress intended to elevate the pleading requirement above the Second Circuit standard" of simple recklessness); Sturm v. Marriott Marquis Corp., 26 F.Supp.2d 1358, 1368-69 (N.D.Ga.1998); see also Hazen § 13.4 at 504 (2000 Pocket Part) (while Congress adopted the Second Circuit's "strong inference" rule as the requisite measure of scienter, "there is some legislative history indicating a rejection of the rule that an inference could be established by allegations that there was both motive and opportunity to commit fraud") (citing cases, as well as H.R. Conf. Rep. No. 104-369, at 41, which indicates that the Senate rejected an amendment that specifically would have incorporated this component of the Second Circuit's standard).
In Novak, the Second Circuit addressed these ambiguities and the related disagreements. Reviewing the relevant PSLRA legislative history, the court found conflicting expressions of legislative intent. See Novak, 216 F.3d at 311. Accordingly, the Circuit Court concluded that Congress plainly sought to impose a stricter uniform pleading standard and did so not by exceeding the Second Circuit's rule, but by effectively lifting the requirement nationwide "to that previously existing in this circuit and no higher (with the exception of the `with particularity' requirement)." Id. at 310. However, that Congress had failed to include language about "motive and opportunity" suggested to the Circuit Court panel that "we need not be wedded to these concepts in articulating the prevailing standard." Id.
In the final analysis, the court held that the PSLRA codified the Second Circuit's "strong inference" rule for pleading scienter. Advising lower courts and litigants that in determining whether pleaded facts sufficiently gave rise to the inference of scienter, they "need and should not employ or rely on magic words such as `motive and opportunity'." Id. at 311. The Court of Appeals pointed for guidance to the various cases and factors described above illustrating the types of particular circumstances the court had recognized as probative of the requisite strong inference. See id.; see also Rothman v. Gregor, 220 F.3d 81, 90-91 (2d Cir.2000) (citing Novak and applying both prongs of the Second Circuit's strong inference standard); Ganino, 228 F.3d at 168-70 (without referring to Novak, restates the Circuit's pre-PSLRA pleading standard, expressly rejecting the argument that the PSLRA eliminated the option to plead scienter *421 based on the defendant's motive and opportunity to commit fraud).[9]
This Court notes that in practice the Circuit Court's instructions in Novak may be subject to different readings, as evidenced by the divergent arguments among the parties here about what the Second Circuit intended and how the factors Novak cites for guidance should be applied to the circumstances of the case at bar. The parties on both sides of the dispute now before the Court contend that Novak supports their respective positions for and against § 10(b) liability here. The crux of the disagreement relates to the Novak language indicating that the precedents the court refers to suggest that the requisite "strong inference" may arise where the complaint alleges that the defendants "knew facts or had access to information suggesting that their public statements were not accurate", or that they "failed to check information they had a duty to monitor." Novak, 216 F.3d at 311. Elaborating on the first of these criteria earlier in the opinion, the court noted that "[u]nder such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." Id. at 308 (emphasis added).
Read narrowly and isolated from their context, these propositions may lend themselves to misinterpretation. Terms such as "failed to check information" or "should have known" occur familiarly in the parlance and jurisprudence of simple negligence and bespeak concepts that could be read to be more compatible with a finding of ordinary carelessness than to the more egregious forms of misconduct that comprise recklessness. See, e.g., Greebel, 194 F.3d at 199 (clarifying that the holding in an earlier case referring to the words "should have known" were understood to convey stricter "reckless disregard sense" [as opposed to mere negligence] that had been applied in prior First Circuit doctrine). To avoid unintended misconstruction, the Circuit Court's guidance must be placed in proper context. In this Court's understanding, the factors Novak cites do not articulate a new, diminished requirement of scienter but only suggest illustrative tests encapsulating particular types of circumstances probative of scienter by which, in light of the PSLRA, the Circuit's actual standard may be applied. See Rothman, 220 F.3d at 85.
Both prefacing and framing the application of the Novak factors is the legal standard of scienter still in effect as it derives from Hochfelder and Rolf. These cases and their progeny continue to demand that in § 10(b) actions plaintiffs plead facts showing scienter, characterized as "intent to deceive, manipulate or defraud". Hochfelder, 425 U.S. at 193, 96 S.Ct. 1375. The standard may still be satisfied by pleadings tending to demonstrate recklessness, defined by existing Second Circuit doctrine as requiring conduct that is "at the least, highly unreasonable" and represents "an extreme departure from the standards of ordinary care". Rolf, 570 F.2d at 47 (emphasis added) (citation omitted). Accordingly, the exemplary rules to which Novak directs district courts for guidance in determining whether plaintiffs' pleadings have satisfied the "strong inference" requirement presuppose that, under the facts and circumstances particular to the given case, the types and degrees of misbehavior alleged to fall within those highlighted by the Novak factors nonetheless constitute severe misconduct that rises to *422 the level of what may be deemed egregious, or that may be found highly unreasonable and represents an extreme departure from acceptable norms of ordinary care.
This construction is supported by explanatory and qualifying language the Novak court is careful to add in clarifying its ruling. Thus, the court references several "important limitations" on the scope of liability for securities fraud based on reckless conduct. See Novak, 216 F.3d at 309. In each instance the specific examples the court offersfraud by hindsight; negative public statements consistent with reasonably available data; failure to adequately monitor the behavior of others; and accounting violations standing aloneimpose constraints that manifest application of the rule solely to forms of highly unreasonable or extreme misconduct, rather than simply to mere deviations from standards of ordinary care. See id. This distinction reaches the undercurrents of deeper issues implicated in the discourse and disaccord among the various courts' interpretations of the PSLRA. More fundamentally, it goes to the heart of Congress's intent in enacting the statute, as well as to the law's substantial implications.

b. Policy and Procedural Objectives

Before applying the PSLRA and Novak's interpretive guidance to rulings on the motions now before it, this Court feels obliged to offer some additional contextual observations touching on these matters, and to suggest the larger framework upon which the Court perceives its determinations here must be grounded. An appropriate point of departure for these considerations is an avowal of the "inevitable tension" that the Second Circuit has acknowledged exists between two social ends. On the one hand, there is the interest of society in deterring and remedying securities fraud by recognizing that victims of fraud generally are unable to particularize their claims until they have gathered sufficient evidence. On the other lies society's countervailing interest in "deterring the use of the litigation process as a device for extracting undeserved settlements as the price of avoiding the extensive discovery costs that frequently ensue once a complaint survives dismissal...." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 263 (2d Cir.1993), cert. denied 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994).
Under the prevailing pre-PSLRA notice pleading rules and practice compelled by Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), coupled with the doctrine that on a motion to dismiss for failure to state a claim plaintiffs' factual allegations are to be deemed true and reasonable inferences to be drawn in their favor, the balance in § 10(b) litigation tended to be solicitous of the complaint. See, e.g. Goldman, 754 F.2d at 1070; Cosmas, 886 F.2d at 12. These pleading standards instruct that a complaint may not be dismissed unless, in Conley's oft-quoted phrase, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45-46, 78 S.Ct. 99. Heeding this mandate, some prevailing case law inclined to the pleading leniency Conley demanded.
In securities fraud cases, despite the particularity required by Fed.R.Civ.P. 9(b) for averments constituting the circumstances of the fraud asserted and the scienter requirement Hochfelder propounded, some courts permitted generalized pleadings or relaxed specificity of the requisite fraudulent intent to survive motions to dismiss, relying for authority on the language of Rule 9(b) itself, which provides that "malice, intent, knowledge, *423 and other condition of mind, may be averred generally". See In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1547 (9th Cir.1994) (en banc) (holding that plaintiff may satisfy the state of mind pleading requirement "simply by saying that scienter existed."); see also Cosmas, 886 F.2d at 12 (noting that under Rule 9(b) a complaint need only aver intent generally, although it nonetheless must allege facts that give rise to a strong inference of fraudulent intent); Goldman, 754 F.2d at 1070 ("Thus, great specificity was not required with respect to the allegations of knowledge and scienter.")
From whatever role, interest, or perspective in litigation one examines the 1995 Reform Act, it is undeniable that, as the Second Circuit has observed, "[t]he landscape of securities fraud litigation has been transformed in recent years by the passage of the PSLRA."[10]Novak, 216 F.3d at 305. When all is said and done, Congress effectively promulgated a special pleading measure for gauging the sufficiency of the complaint in securities fraud actions, allegations of scienter in particular, that is more stringent than that which, under the Conley doctrine, applies to other causes of action challenged on a motion to dismiss. See Greebel, 194 F.3d at 195 ("While under Rule 12(b)(6) all inferences must be drawn in plaintiff's favor, inferences of scienter [in § 10(b) actions] do not survive if they are merely reasonable, as is true when pleadings for other causes of action are tested by motion to dismiss under rule 12(b)(6)."); cf., Leslie Fay Cos. Sec. Litig., 871 F.Supp. 686, 694, n. 6 (S.D.N.Y.1995)("Alleging facts raising a reasonable inference of intent meets that [scienter] standard.")(citing Goldman, 754 F.2d at 1070).
Read cumulatively, the relevant provisions of the 1995 Reform Actthe particularity demanded by Subsection (b)(1); the specificity of the `strong inference' standard codified in Subsection (b)(2); the instruction of Subsection (b)(3)(A) to the courts to dismiss complaints that fail to meet the mandated strengthened pleading standards; and the automatic stay on discovery imposed by Subsection (b)(3)(B), as a whole now compel judicial treatment of Rule 12(b)(6) motions to dismiss securities fraud complaints uniformly, in a manner appreciably different from the divergent procedural practice in effect in many circuits before the PSLRA, and from the way such motions relating to many other causes of actions may still be handled.
Viewing them in tandem, these provisions signal Congress' intent to recalibrate the balance in securities litigation, the adjustments now tilting decidedly in the direction against easier pleadings and in favor of earlier dispositive rulings on the sufficiency of a challenged complaint. Manifest in the 1995 Reform Act is the mandate that courts assess the legal sufficiency of plaintiffs' securities fraud allegations according to what plaintiffs know at the time the complaint is filed, rather than what they wish to learn through discovery and recover from defendants merely by reason of commencing an action charging fraud. See SG Cowen Sec. Corp. v. U.S. District Court, 189 F.3d 909, 912 (9th Cir. 1999).
*424 A closer look at the history and abuses that produced the PSLRA evinces other procedural and policy effects occasioned by the reforms, consequences that run through the courts' consideration of the statute and amplify the underlying interpretive differences. These issues bear significantly on the motions at hand and how the Court should approach their disposition. Perhaps most far-reaching among the PSLRA's implications is the role of the court itself in administering the standards now mandated by the law. By placing a higher premium on particularity in plaintiffs' assertions of fraud, exacting a stricter standard of pleading scienter and thereby raising the stakes on Rule 12(b)(6) motions to dismiss, the PSLRA also imposes a relatively higher burden on the court in securities fraud actions to render judgment at the pleading stage of a case on the basis of inquiries that embody both heightened quantitative and qualitative aspects.
First, the quantum of allegations specifying fraud must be sufficiently factual and particular to pass muster under Subsection (b)(1). And substantively, linked together contextually and weighed with reasonable inferences drawn in plaintiffs' favor, the facts pleaded must point strongly to an inference that defendants harbored intent to deceive, manipulate or defraud. These qualitative judgments entail a prophylactic design. The courts must, at an earlier stage of proceedings and on the basis of a less developed record, distinguish from among plaintiffs' claims the legally sufficient action from the solely extortionate, and divide the true victims from transparent mercenaries and opportunists. Sooner distinctions are also indicated from among and for the benefit of defendants. This objective reflects the realities of securities fraud litigation, reaffirming that the marketplace houses both the manipulators and the manipulated, the perpetrators of fraud and deceit and those who are drawn, sometimes unwittingly, into actionsby other defendants as well as by plaintiffs.
In prompting speedier qualitative determinations, the PSLRA suggests a recognition of another reality. Allegations that a person acted deliberately to defraud or deceive, or engaged in conduct reflecting extreme departures from acceptable legal norms in connection with publicly regulated securities transactions affecting not just one or a handful of persons, but very large numbers of investors and markets, are grave charges that should not be treated lightly. As the Supreme Court has recognized, the operative terms § 10(b) and Rule 10b-5 employ"manipulative", "deceptive", "device", "scheme", "contrivance", "artifice", "to defraud"  are strong words. See Hochfelder, 425 U.S. at 197, 96 S.Ct. 1375. These terms may do more than sting the sensibilities of those so denounced. This legislative expression is laden with moral and pejorative meaning. As such, the impacts of accusations of intentional fraud may far exceed economic harm and mere vexation and inconvenience to the persons accused. Rather, the stigma associated with willful or egregious fraudulent behavior, even when published as mere unsubstantiated allegations, may work to impair reputations and extend in a consequential chain reaction to other aspects of personal and business affairs.
For these reasons, to the extent fraud allegations are fundamentally insufficient to state a claim, and name particular parties essentially to serve plaintiffs' tactical designs, defendants should not be put to the test of and burdened by defeating baseless charges only after full discovery or trial. By the same token, the implied ends the statute projects manifest that some plaintiffs often paint and taint with unduly and unfairly broad brush strokes. To encourage or tolerate unrestrained accusations of deception to be turned into *425 sport and profit not only minimizes the perceived infamy and wrongfulness of fraud, but also depreciates the real hardships that unfounded charges visit upon the undeservedly maligned persons whose names and livelihoods may be placed in the balance.
The duties the courts must discharge in this respect at the Rule 12(b)(6) motion stage also reflect the relativism referred to in the introductory paragraph above. To achieve the general ends of the PSLRA detailed here calls for drawing early distinctions of degree along the spectrum of culpability, recognizing the appropriate differentials which may define and distinguish the diverse roles played by the various actors who may have a part in any wrongful event, and enabling a separation of the innocent from the guilty, the active from the passive, the ordinary deviation from the egregious. For example, depending on particular circumstances and varying relationships, the knowledge and intent possessed by executives of a corporation's senior management who set events in motion and drive the wrongful actions, may not equate on a scale of fault with that of outside parties situated farther downstream in time and space from particular transactions and representations. Implicit in the overall scheme of the 1995 Reform Act is that at a sooner stage in the proceedings than ordinarily would occur, the process should incorporate a means of sifting and exculpation designed to relieve from the burdens of litigation any parties who as a matter of law did not belong in the action in the first place.
To this end, and possibly of greatest moment, is that, if the implicit design of the PSLRA is correctly understood, these differential and inferential judgments, probably with higher incidence than earlier prevailed, now are more likely to devolve upon the court. This added judicial responsibility is no small matter. In fact, in fundamental ways it represents a profound departure from prior practice.
For, under pre-PSLRA philosophy of pleading that applied in some circuits, the rules permitted complaints to allege state of mind generally. This doctrine, grounded on the prescription of Rule 9(b) that pleadings of malice, intent, knowledge, and other condition of mind may be averred generally, see Fed.R.Civ.P. 9(b), leaned toward greater judicial generosity to the complaint and weighed in favor of allowing some general pleadings of scienter to survive motions to dismiss. See, e.g., GlenFed, 42 F.3d at 1547; Cosmas, 886 F.2d at 11 ("On a motion to dismiss, a court must read the complaint generously, and draw all inferences in favor of the pleader."). On this approach, judges at the pleading stage perform their vital function of preserving for the jury its traditional province as ultimate finder of fact. The evidentiary determinations of whether or not plaintiffs' contentions satisfy the standard of scienter, and what reasonable inferences about knowledge, motives and intent could be drawn from facts adduced, would be made by the court, with greater frequency based on the more ample record produced on motions for summary judgment, or else by a jury on a comparable evidentiary foundation.
Even assuming application of more stringent measures of particularity and scienter, Rule 9(b)'s relaxation of the specificity requirement for scienter could serve as a constraint which would enable complaints to survive dismissal, thereby raising the prospects that factual and inferential determinations ultimately could reach a finder of fact on a fuller record. See, e.g., Leslie Fay, 871 F.Supp. at 694, n. 6 (referring to Rule 9(b), the court indicated that a reasonable inference of intent is *426 sufficient to satisfy the scienter standard) (citing Goldman, 754 F.2d at 1070).
The PSLRA, by contrast, declares that where the complaint alleges defendants acted with a "particular state of mind" the pleading must state with particularity facts giving rise to a strong inference that defendants acted with the required state of mind. See 15 U.S.C. § 78u-4(b)(2). This stricture cannot be read as other than a reversal of prior jurisprudence governing the relevant point. Coupled with the mandate of Subsection (b)(3)(A) that non-complying pleadings are to be dismissed, and of Subsection (b)(3)(B) that discovery may not proceed until any motion to dismiss is decided, the message Congress delivered could not be more blunt or unambiguous. Succinctly put, as the First Circuit has noted:
In the guise of tinkering with procedural requirements, Congress has effectively, for policy reasons, made it substantively harder for plaintiff to bring securities fraud cases, through the "strong inference" of scienter requirements.
Greebel, 194 F.3d at 196 n. 9.
At the very least, the 1995 Reform Act reflects an amber signal giving the courts, at minimum, added grounds to pause before sustaining the sufficiency of a § 10(b) securities fraud complaint challenged on Rule 12(b)(6) motions to dismiss. Beyond that threshold, the statute may be read to command heightened scrutiny of securities fraud pleadings and more finely-tuned judgments about the legal sufficiency of allegations of defendants' state of mind. In sum, the PSLRA suggests that on a motion to dismiss § 10(b) claims, judicial generosity should now yield some ground to particularitymandates that suggest the likelihood of engendering more dispositive judicial determinations at the pleading stage of securities fraud litigation. At bottom, these measures and guideposts represent value-laden choices of national policy and priorities that fall well within Congress' prerogatives to legislate, and that it is the courts' task to effectuate.

VI. APPLICATION OF THE SECURITIES STATUTES TO PLAINTIFFS' CLAIMS

Because of the significant difference in the time and scope of defendants covered by the two actions here under review, the discussion below treats the Noteholders' and Rieger Actions separately and in turn considers the motions of the various groups of defendants.

A. THE NOTEHOLDERS' ACTION

1. Deloitte's Motion: Section 10(b)

a. The Revenue-Generating Transactions

The Noteholders allege that D & T's actual fraudulent intent or recklessness can be inferred because Livent should have recognized revenue for the revenue-generating transactions over time. As described above, however, each of the agreements at issue, purported to make the fee Livent paid non-refundable regardless of whether Livent ever made the shows available.
As Livent had performed its obligations under the agreements by granting the exclusive right to schedule the shows, revenue recognition was warranted under Canadian GAAP. The Noteholders acknowledge that D & T Canada investigated the terms of the American Artists transaction and concluded that these agreements were not forward contracts. NH SAC ¶ 75. Moreover, D & T's actions as regards the Dundee and Dewlin transactionsfirmly resisting the insistence of Drabinsky and Gottlieb for revenue recognition, threatening to resign in one instance and obtaining an opinion *427 of a third independent auditor in another are not consistent with passive acquiescence in the face of knowledge that might support a finding of sufficient recklessness. The Court is not persuaded that under the PSLRA's heightened pleading standard of scienter as construed above, the Noteholders' allegations against D & T as regards the revenue-generating transactions are sufficient to create a strong inference of intentional misconduct or recklessness. See Novak, 216 F.3d at 307-08. At best, in this connection the Noteholders have alleged negligence on D & T's part.
The Noteholders' allegation that revenue recognition from the various transactions was improper because Livent had future performance obligations to stage the shows is undermined by their own admission and by the contracts themselves. See Trans World Airlines, 449 F.2d at 63; see also discussion supra Part V.A. In the absence of the side agreements, the non-refundable fees could properly be recognized under Canadian GAAP because they were not contingent on Livent's subsequent production of the shows. Accordingly, the Noteholders have alleged nothing to show that D & T's revenue recognition decision was not made in good faith.

(i) The Dundee Transaction

The Noteholders allege that D & T Canada's actions with respect to the Dundee transaction also give rise to a strong inference of fraudulent intent or sufficient recklessness. This Court disagrees. D & T initially opined that because of the Put Agreement, revenue from the Dundee transaction should not be recognized in the second quarter of 1997, but Gottlieb provided Deloitte with a revised Dundee agreement which omitted the Put Agreement and he represented that no consideration was necessary for the removal of the condition. D & T then advised that revenue should be recognized only in the third quarter. Nevertheless, Gottlieb pressed for recognition during the second quarter, and presented confirmation from Dundee and an opinion of counsel which supported his position. D & T refused to accept the accounting in the second quarter, even threatening to resign, and Livent ultimately agreed to reverse the recognition (which totaled $6 million). Livent allegedly "reversed accrued liabilities [of 1.2 million] ... to maintain a profitable quarter in line with the previous year." NH SAC ¶ 86.
But a comparison of Livent's 1997 financials for the second quarter of 1997 reveals that, contrary to the Noteholders' assertion, Livent's accrued liabilities remained constant. Compare Livent's Press Release, date August 14, 1997 at 2, with Livent's Form 6-K, dated September 8, 1997 at 5. Moreover, Livent's revised second quarter 1997 income of only $1 million was significantly lower than its second quarter 1996 net income of some $3.5 million. The Noteholders' pleadings in this regard are thus contradicted by the very public filings on which they rely, rendering this claim insufficient to withstand a motion to dismiss. See Trans World Airlines, 449 F.2d at 63.
In April 1998, D & T discovered another Put Agreement dated August 1997, and, when confronted, Gottlieb stated that no such Put Agreement or arrangement existed. D & T requested and received a written confirmation from Dundee that the Put Agreement had indeed been cancelled. On this basis, the Court finds the Noteholders' allegations insufficient to permit a strong inference of scienter on the part of D & T. In fact, the allegations confirm Gottlieb's active efforts to conceal the fraudulent conduct from D & T. Although the Noteholders characterize the circumstances *428 surrounding the Dundee transaction as "patently suspicious," D & T's continued trust in Gottlieb and Dundee was at worst negligent. The Noteholders' allegation that the balance sheet was adjusted "to maintain the appearance of a quarter as profitable as the same period last year," as already noted, does not raise any inference of recklessness or actual fraudulent intent on the part of D & T. Finally, the Noteholders have failed to assert that D & T had any role in either drafting or issuing the September 4, 1997 press release.

(ii) CIBC Wood Gundy Transaction

The Noteholders admit in their complaint that the secret CIBC Wood Gundy transaction side letters were concealed from D & T Canada. Moreover, as with the American Artists, Pace, and Dewlim transactions, the agreement with CIBC Wood Gundy expressly provides that CIBC Wood Gundy's payment of the fee to Livent was non-refundable. As already described, in accordance with Canadian GAAP, revenue recognition was therefore permissible under these circumstances. In the Court's view, strong inference of recklessness or fraudulent intent cannot be drawn against D & T in this regard.

b. Livent's Manipulation of Its Books and Records

The Noteholders argue that D & T was reckless in failing to discover Livent's manipulations of its accounting books and records. Specifically, they allege that Livent transferred pre-production costs for shows to fixed asset accounts, erased expense entries and related liabilities from the general ledger, and transferred costs from one show currently running to another show that had not yet opened or that had a longer amortization period.
The Noteholders maintain that the adjustments were such that had D & T conducted a proper audit, the irregularities would have been discovered. Additionally, the Noteholders complain that although D & T detected several significant accounting irregularities through random audits, it failed to follow up, expand its sampling, and investigate thoroughly. Specifically the complaint asserts that when D & T audited a random sampling of accounts payable recorded in the first two months of 1998  about $2,000,000 in disbursements  it found that 25 percent of the total had improperly been pushed back into 1998 when they had, in fact, been incurred in 1997. D & T corrected every error it found, but given the magnitude of the misallocations uncovered, D & T should have been alerted to the possibility of deliberate manipulation and expanded its sampling. This Court considers D & T's failure to do so, upon discovering truly egregious accounting errors, and in combination with other extreme departures from ordinary care described below, gives rise to a strong inference of recklessness. These actions, if sustained, reflect an overlooking of obvious signs, an egregious refusal to investigate the doubtful that extends well beyond mere failure to identify problems with Livent's internal controls or accounting practices. See Novak, 216 F.3d at 307-08; Chill, 101 F.3d at 269.
Similarly, D & T requested documentation to support a sampling of Livent's expenses assigned to fixed asset accounts  approximately 60 entries. During this sampling, the auditors found that the supporting documentation indicated that there had been fraudulent classification of construction costs in many cases. When D & T asked for further substantiation, Livent produced documentation only with respect to those items that could be substantiated, while ignoring the other requests. D & T repeatedly asked for the back-up for the *429 remaining items, but to no avail. Ultimately, D & T simply stopped asking.
Standing alone, this charge may not rise to the level of recklessness. But, against a relevant backdrop of allegations concerning (1) the repeated difficulties D & T had encountered with the Inside Directors' dubious financial practices manifest in the revenue-generating transactions, (2) D & T's failure to expand the sampling of the 1998 disbursements, and (3) assertions that even in the light of Livent's numerous questionable practices and D & T's expressed concerns, D & T nonetheless continually changed the account officers in charge of Livent's audits to new, inexperienced staff unfamiliar with Livent's prior history, a strong inference of recklessness may be drawn sufficient to withstand a motion to dismiss. Unlike D & T's responses relating to the revenue-generating transactions, with regard to which D & T strongly challenged Drabinsky and Gottlieb and repeatedly rejected their manipulations until they either backed down or went around the auditors, D & T's actions and omissions in connection with Livent's manipulations of its books and records display acquiescence and passivity that, in this Court's reading of the pleadings, cross over the boundary of ordinary breaches of reasonable care into the zone of recklessness. Viewing these circumstances in their totality, the Court finds that D & T could be deemed to have failed to review or check information that it had a duty to monitor, or ignored obvious signs of fraud. See Novak, 216 F.3d at 308; Rolf, 570 F.2d at 47-48.
Accordingly, the Court grants D & T's motion to dismiss as to the Noteholders' § 10(b) claims regarding the revenue-generating transactions but denies the motion with respect to the allegations relating to Livent's manipulations of its books and records.

2. Deloite's Motion: Section 11 Liability and Rule 9(b) Pleading Requirement

D & T argues that the Noteholders' § 11 claim sounds in fraud and therefore should be dismissed for failure to satisfy the heightened pleading requirements of Rule 9(b). The Noteholders counter that their § 11 claim does not sound in fraud, but in negligence, and hence heightened pleading requirements are inapplicable.
The Second Circuit has not addressed whether Rule 9(b)'s heightened standards are applicable to actions brought pursuant to § 11 of the Securities Act. Courts in the Southern District are divided on the question. See, e.g., Griffin v. PaineWebber, 84 F.Supp.2d 508, 513 (S.D.N.Y.2000) (noting split within the District); In re N2K Inc. Sec. Litig., 82 F.Supp.2d 204, 210 n. 10 (S.D.N.Y.2000) (Rule 9(b) applies); Schoenhaut v. American Sensors, Inc., 986 F.Supp. 785, 795 (S.D.N.Y.1997) (same); Geiger v. Solomon-Page Group, Ltd., 933 F.Supp. 1180, 1189 (S.D.N.Y.1996) (same); In re In-Store Advertising Sec. Litig., 878 F.Supp. 645, 650 (S.D.N.Y.1995) (Rule 9(b) inapplicable); Nelson v. Paramount Communications, Inc., 872 F.Supp. 1242, 1246 (S.D.N.Y.1994) (same).
Several courts have declined to apply Rule 9(b)'s pleading requirement where plaintiffs "selectively parsed their complaint to indicate that their claims under section 11 are based upon negligence." In re Chambers Dev. Sec. Litig., 848 F.Supp. 602, 624 (W.D.Pa.1994). As the Eighth Circuit noted in In re NationsMart Corp. Sec. Litig., "[t]he only consequence of a holding that Rule 9(b) is violated with respect to a § 11 claim would be that any allegation of fraud would be stripped from the claim. The allegations of innocent or negligent misrepresentation, which are at *430 the heart of the § 11 claim, would survive." 130 F.3d 309, 315 (8th Cir.1997).
Here, the gravamen of the Noteholders' complaint sounds in fraud, but the complaint attempts to segregate the Securities Act claims from the Exchange Act claims by listing them under separate headings and expressly stating that they sound in negligence, not fraud. Such a boilerplate disclaimer was rejected in In re American Bank Note Holographics, Inc. Sec. Litig., 93 F.Supp.2d 424 (S.D.N.Y.2000). There, plaintiffs asserted § 10(b) and § 11 claims against the company's directors and officers but asserted only § 11 claims against the underwriters. The court held that Rule 9(b) applied with respect to the § 11 claims asserted against the company's directors and officers because the plaintiff alleged a scheme of fraud against them. The court found that fraud had been stated with particularity.
However, as noted above, the Noteholders in the case at hand have sufficiently alleged negligence on the part of D & T as separate, alternative claims independent of the fraud claims. Since misrepresentation is all that is required to sustain a claim under § 11, the Noteholders would be unduly burdened if the Court were to dismiss their separately standing negligence claims just because the predominant theory the complaint expresses is one of fraud. Such a conclusion would undermine Rule 8(e)(2), which provides that "[a] party may ... state as many separate claims or defenses as the party has regardless of consistency. ..." Fed.R.Civ.P. 8(e)(2). See discussion supra Part V.A.
Accordingly, the Court denies D & T's motion to dismiss the Noteholders' § 11 claim.

3. PaineWebber, Furman Selz, and CIBC Motion: Section 11 Claim

The Noteholders allege that Furman Selz and PaineWebber were underwriters for the issuance of the Notes. PaineWebber and Furman Selz argue that they did not underwrite the Livent Notes, and therefore cannot be held liable under § 11. In their brief in opposition to the motion to dismiss, the Noteholders counter that PaineWebber and Furman Selz required Livent to enter into a registration rights agreement, executed before the sale of the Private Notes, obligating Livent to replace the Private Notes with registered notes within 120 days. Once that agreement was in place, the two firms purchased Livent's entire offering of the Private Notes and immediately resold them to qualified institutional purchasers ("QIPs"). Indeed, the Registration Statement confirms that "the Exchange Offer is being made to satisfy the obligations ... under the Registration Rights Agreement relating to the Private Notes." The Noteholders allege that because PaineWebber and Furman Selz solicited institutions to purchase the unregistered notes by promising them that they would soon receive registered notes with the same terms, they "`provided outlets for the [securities] of issuers and thus were underwriters.'" Mem. at 10 (quoting United States v. Wolfson, 405 F.2d 779, 782 (2d Cir.1968)).
As noted above, § 11 provides a cause of action only for purchasers of securities issued pursuant to a registration statement and not for purchasers of unregistered securities issued through a private placement. See Anisfeld v. Cantor Fitzgerald & Co., 631 F.Supp. 1461, 1464 (S.D.N.Y.1986).
PaineWebber and Furman Selz claim they purchased the unregistered Private Notes issued by Livent in October 1997, and immediately resold the Private Notes to QIPs under Rule 144A of the Securities Act, and to foreign purchasers, in a private *431 placement exempt from the registration requirements of the Securities Act. Rule 144A "permit[s] unlimited resales of securities that have never been registered under the 1933 Act, so long as all such sales are made to a specific class of large institutional investors." Hazen, § 4.26.1, at 302.[11]
Rule 144A offerings are often followed by SEC-registered exchange offers (referred to as "AB exchange offers" or "Exxon Capital exchange offers") where the issuer (usually pursuant to a contractual commitment in the Rule 144A offering documents) offers to holders of the Rule 144A securities to exchange those securities for similar securities which have been registered and, therefore, are freely resalable. Participants in the exchange offer receive freely resalable securities only if they are not affiliated with the issuer, acquired the original securities in the ordinary course of business and do not have an arrangement with the issuer for the distribution of the exchange securities. Under these circumstances, the exchange of privately placed securities for similar registered securities occurs without subjecting the holders to classification as underwriters. See Exxon Capital Holding Corp., SEC No-Action Letter (May 13, 1988), Morgan Stanley & Co. Incorporated, SEC No-Action Letter (June 5, 1991), and their many progeny.
By escaping the "underwriter" designation, the private purchasers are deemed not to be engaged in distribution of covered securities and could re-sell such securities without filing their own registration statement. See Securities Act § 4(1), 15 U.S.C. § 77d(1) (exempting transactions by persons other than issuers, underwriters or dealers from the registration requirements of § 5). The exemption from registration accorded to qualifying resales, eliminating the time and expenses associated with such filing, enables issuers to raise capital by promoting liquidity in the secondary markets for the securities and also enhances the attractiveness of domestic markets to foreign and local investors. In the Private Offering Memorandum, Livent required PaineWebber and Furman Selz to represent that they fit within this safe haven. See Private Offering Mem. at 79-80, attached as Ex. A to Gilman Aff.
PaineWebber and Furman Selz contend that the Exxon Capital Exchange provisions apply specifically to purchasers of unregistered securities who later exchange them for registered securities. It is these private purchasers who are prohibited from having made arrangements to participate in the distribution of the securities in order to avoid "underwriter" liability.
PaineWebber and Furman Selz, however, resold the unregistered securities and thus did not take part in the actual exchange of the unregistered notes for registered notes or in the subsequent resale of those notes. The fact that they were heavily involved as initial purchasers who essentially orchestrated the subsequent sale of the unregistered securities to QIPs does not make them liable as underwriters of the sale of registered securities. To import underwriter liability for entities that serve as initial purchasers prior to an Exxon Capital Exchange would render Rule 144A ineffective for a very substantial number of securities transactions, and defeat the capital market financing objectives the Rule 144A exemption was designed *432 to achieve, a fact which would undoubtedly have been known and addressed by the promulgators of Rule 144A if such a major exception was intended. Therefore, this Court concludes that § 11 liability for securities purchased pursuant to a registration statement does not apply to initial purchasers of unregistered securities who were not directly involved in the preparation of the registration statement or in the subsequent exchange for registered securities of unregistered securities that the initial purchasers no longer held.
CIBC may stand in a very different position from PaineWebber and Furman Selz because the Noteholders indicate in their opposition memorandum that CIBC sold notes directly to them. This claim, however, is not specifically alleged in the complaint. Accordingly, the Noteholders' § 11 claim against CIBC is dismissed for the reasons stated above but with leave to replead.
Furman Selz and PaineWebber have also argued that the § 11 claims against them are barred under the one-year statute of limitations pursuant to § 13 of the Securities Act, 15 U.S.C. § 77m. Because the motions of Furman Selz and PaineWebber are granted as indicated above, there is no need to address whether the claims are time-barred.

4. PaineWebber/Furman Selz Motion: Section 12 Claim

PaineWebber and Furman Selz also move to dismiss the Noteholders' § 12 claim against them. The Noteholders do not oppose the motion, and the claim is accordingly dismissed with prejudice.

5. CIBC Wood Gundy and CIBC Oppenheimer's Motion: Section 10(b) Claims

CIBC argues that the Noteholders' § 10(b) claims should be dismissed on the grounds that the complaint contains no allegation of any misstatement or omission by CIBC, and that the Noteholders have not properly alleged scienter, motive and opportunity, or loss causation.
The Noteholders allege that CIBC Wood Gundy entered into a fraudulent transaction with Livent, "[knew] of Livent's true financial condition and directly participated in misrepresenting that condition to the investing public in connection with the sales of Notes," NH SAC ¶ 245, and "solicited and were substantial factors in plaintiffs' purchase of the Notes," NH SAC ¶ 33. The Noteholders have adequately detailed the allegations with respect to CIBC's involvement in the fraudulent CIBC Wood Gundy transaction itself, but they have not alleged, with the specificity required by Rule 9(b), how CIBC participated in misrepresenting Livent's financial condition to the investing public, or CIBC's involvement in the sale of the Notes, or how CIBC benefitted in some concrete and personal way from the alleged fraudulent conduct that would represent an extreme departure from the standards of ordinary care. See Novak, 216 F.3d at 307-08; Chill, 101 F.3d at 269.
The Noteholders argue that CIBC solicited them to purchase the Notes that the CIBC underwriters were holding for their own account without disclosing their participation in Livent's fraud. This allegation is not in the complaint, however. It is asserted in the Noteholders' opposition memorandum in connection with this motion. The complaint cannot, of course, be amended by the briefs in opposition to a motion to dismiss. See Lazaro v. Good Samaritan Hosp., 54 F.Supp.2d 180, 184 (S.D.N.Y.1999).
Accordingly, the Noteholders have not pleaded fraud against CIBC with the particularity required by Rule 9(b) and the *433 PSLRA. However, since it is not at all clear that the Noteholders could not state a claim against CIBC on the basis at issue, the Court grants leave to replead within twenty (20) days of the date of this Decision and Order.

6. CIBC Motion: Section 12(a)(2) Claim

The Noteholders do not oppose the dismissal of their § 12 claims against CIBC. Accordingly these claims are dismissed with prejudice.

7. Outside Directors Motion to Dismiss: Section 10(b) Claim

The Outside Directors argue that the Noteholders' § 10(b) claims should be dismissed for failure to plead scienter with the particularity required by Rule 9(b) and the PSLRA.
As was the case with their claims against D & T, the Noteholders do not allege the motive and opportunity prong as the basis for the scienter requirement in regards to the Audit Committee. Instead, the Noteholders seek to satisfy the test of strong circumstantial evidence of fraudulent intent by alleging that: (1) the Outside Directors who served as members of the Audit Committee were responsible for reviewing Livent's financial reporting procedures, internal controls, and management information systems, and the performance of Livent's external auditors; (2) the Outside Directors were primarily responsible for reviewing the quarterly unaudited financials; (3) there were several "red flags" which the Audit Committee failed to investigate or ignored, namely: (a) the improper revenue recognition from contracts where performance had not been completed; (b) the discovery of the Put Agreement; (c) Drabinsky's and Gottlieb's prior history at Cineplex Odeon; and (d) the magnitude of the fraud.
In this Courts' reading the PSLRA's heightened pleading standard, these allegations standing alone are insufficient to raise a strong inference of fraudulent intent. First, the complaint does not allege that the Audit Committee participated in any of the five fraudulent revenue generating transactions, or benefitted in some concrete and personal way from the fraudulent conduct the Noteholders assert. See Novak, 216 F.3d at 307-08. Nor does the complaint allege facts supporting a strong inference of intentional misconduct or recklessness. See id. As described in the analysis of the standard discussed above, reckless conduct in a § 10(b) claim "represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Chill, 101 F.3d at 269; see Jacobs, 1999 WL 101772, at *16 ("[J]ust because a defendant is a director and member of the company's audit committee does not lead automatically to an inference that the person acted with conscious disregard of a known risk as opposed to with gross negligence or even negligence."); In re WRT Energy Sec. Litig., No. 96 Civ. 3610, 1997 WL 576023, at *14 (S.D.N.Y. Sept.15, 1997).
The same allegations in the complaint that satisfy the pleading requirements as to Inside Directors Drabinsky, Gottlieb, Topol, and Messina  namely, Livent's double accounting system and the meetings held in its service  work against the "strong inference" that the Audit Committee would have been aware of the fraud, since the double system left no paper or transaction trail and the Outside Directors relied on the representations of management and on D & T to perform the audit.
With regard to the Put Agreement, the complaint describes how Gottlieb told the Audit Committee on at least two occasions *434 that the Agreement had been cancelled. The Noteholders make much of how D & T's discovery should have alerted the Audit Committee to Gottlieb's suspicious behavior. At best, however, as the allegations of the complaint now stand, any failure on the part of the Outside Directors to investigate further may be suggestive of negligence, but not of the extreme departure from ordinary care required to constitute recklessness. See Novak, 216 F.3d at 307-08; Chill, 101 F.3d at 269; Rolf, 570 F.2d at 47.
Finally, the Noteholders also allege that the magnitude of the fraud itself suffices to satisfy the scienter requirement as to the Audit Committee. As set forth in the discussion above regarding D & T, this allegation, by itself, is insufficient to establish a strong inference of fraud. The complaint does raise questions regarding the Audit Committee's performance, particularly with regard to whether it fulfilled its defined responsibility to review Livent's financial reporting procedures, internal controls and management information systems, and the performance of external auditors.
As the complaint now stands, however, the allegations are insufficient to raise the strong inference of scienter necessary to survive the Audit Committee members' motion to dismiss, which the Court grants.
The Noteholders may seek leave to replead their § 10(b) claim against the Outside Directors within twenty (20) days of the date of this Decision and Order, but leave shall be granted only upon a convincing demonstration that there are factual allegations which have not been tested in either this action or any related actions before this Court based on the same core facts and transactions, and which if true would suffice to state a claim upon which relief may be granted.

8. Outside Directors' Motion: Section 11 Claims

a. Rule 9(b)

The Outside Directors contend that the Noteholders' § 11 claim against them should be dismissed under Rule 9(b) because it "sounds in fraud" but fails to plead fraud with particularity. For the reasons discussed above with respect to D & T's similar argument, the Court holds that Rule 9(b) is inapplicable to the Noteholders' § 11 claims.
The Outside Directors concede that the Registration Statement was materially false and misleading, and that they signed it. Some courts have held that Securities Act claims that "sound in fraud" must be pleaded with particularity. But here, the complaint asserts a § 10(b) claim only against the three Audit Committee members. Since no allegation of fraud is asserted with respect to the other Outside Directors, Rule 9(b) does not apply to preclude the Noteholders' § 11 claims. The Outside Directors' motion to dismiss the complaint on this ground is denied.

b. Standing

The Outside Directors contend that the Noteholders lack standing to prosecute any claims against them under § 11 because the Noteholders allegedly purchased their Notes in the after market, rather than in the initial public offering. In support of this argument, they rely on the Supreme Court's decision in Gustafson v. Alloyd Co., 513 U.S. 561, 564, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), which limits claims under § 12 to purchasers in the original public offering.
The Outside Directors reliance on Gustafson, however, is misplaced. In Gustafson, the Supreme Court interpreted § 12 of the Securities Act, 15 U.S.C. § 77l, rather than § 11, and limited its decision to *435 determining what was a "prospectus" under § 12. Dicta in Gustafson may indicate that a suit under § 12 may be maintained only by a person who purchased the stock in the offering under the prospectus. See 513 U.S. at 571-72, 115 S.Ct. 1061. But the Court gave no indication that it intended this restriction to apply to § 11.
The Outside Directors rely on the Supreme Court's statements in Gustafson that §§ 11 and 12 are "statutory neighbors" to bolster their argument that § 11 applies only to investors who purchased their stock in the initial offering. However, while §§ 11 and 12 are indeed parallel statutes, their wording is significantly different as it relates to the persons empowered to institute an action under the statute. As already noted, § 11 authorizes suit without restriction by "any person acquiring such security." Section 12, by contrast, permits an action against a seller of a security offered by prospectus to be commenced only by "the person purchasing such security from him," thus limiting the plaintiffs allowed to sue under the statute to those who purchased the security directly from the issuer of the prospectus. 15 U.S.C. § 77l(a)(2).
Congress's decision to use "from him" in § 12 but not in § 11 must mean that Congress intended a different meaning in the two sections. See Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.") (citations and internal quotation marks omitted). Further, there is nothing in the reasoning or underlying logic of Gustafson that indicates that § 11 should be read to contain the express privity requirement of § 12.
Although the Second Circuit has not addressed the issue since Gustafson, the Ninth Circuit considered the precise question in a ruling that accords with the foregoing reading of the text. See Hertzberg v. Dignity Partners, 191 F.3d 1076, 1080-81 (9th Cir.1999). Prior to Gustafson, courts had uniformly allowed for recovery under § 11 by purchasers in the aftermarket. See Versyss Inc. v. Coopers and Lybrand, 982 F.2d 653, 657 (1st Cir.1992) (Section 11 "is remarkably stringent where it applies, readily imposing liability on ancillary parties to the registration statement (like accountants) for the benefit even of purchasers after the original offering"); Barnes v. Osofsky, 373 F.2d 269 (2d Cir. 1967); Columbia General Inv. Corp. v. SEC, 265 F.2d 559, 562 (5th Cir.1959) ("Persons other than those who purchase the new stock under the Registration may be affected in point of fact and may, under certain circumstances, have remedies in point of law for misrepresentations in a Registration").
The most basic canon of legislative interpretation instructs us that where the meaning of a statute is clear from the text, there is no need to look any further. See Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). Here, however, even if the wording of the statute was ambiguous, the legislative history supports the reading of § 11 discussed above.
The House Report accompanying the version of the bill that ultimately became the Securities Act of 1933 provides:
the civil remedies accorded by [Section 11] are given to all purchasers ... regardless of whether they bought their securities at the time of the original offer or at some later date, provided, of course, that the remedy is prosecuted within the period of limitations provided by section 13.
*436 H.R.Rep. No. 73-85, at 22 (1933). By expressly referring both to purchasers who acquired their securities "at some later date," as well as to those who bought "at the time of the original offer," the Report makes clear that purchasers in the aftermarket are intended to have a cause of action under the Section. Similarly, when Congress amended § 11 in 1934 to add a requirement of proof of reliance on the registration statement if there had been an intervening earnings statement, the House Report stated: "The basis of this provision is that in all likelihood the purchase and price of the security purchased after publication of such an earning statement will be predicated upon that statement rather than upon the information disclosed upon registration." H.R. Conf. Rep 73-1838, at 41 (1934). By referring to purchases after publication of an earnings statement, the Report reaffirms that purchasers in the aftermarket are within the group of investors provided a cause of action by § 11.
This holding is consistent with four decisions by district courts in this District. See Adair v. Bristol Tech. Sys., Inc., 179 F.R.D. 126, 130-33 (S.D.N.Y.1998); Salomon Smith Barney v. Asset Securitization Corp., Fed. Sec. L. Rep. ¶ 90,273 at 93,492, 1999 WL 1095605 (S.D.N.Y. Dec. 3, 1999); Milman v. Box Hill Sys. Corp., 192 F.R.D. 105, 107 (S.D.N.Y.2000); In re Ultrafem, Inc. Sec. Litig., 91 F.Supp.2d 678, 694 (S.D.N.Y.2000).
Accordingly, the Outside Directors' motion to dismiss the Noteholders § 11 claim for lack of standing is denied.

9. Outside Directors' Motion: §§ 12 and 15 Claims

The Noteholders do not oppose the Outside Directors' motion with respect to the §§ 12 and 15 claims. Those claims are accordingly dismissed with prejudice.

10. Outside Directors' Motion: § 20(a) Claims

The Audit Committee defendants argue that the complaint fails to allege that they were controlling persons, or that they culpably participated in the alleged fraud within the meaning of § 20(a) of the 1934 Act.
The elements necessary to state a claim under a "control person" theory of liability are set forth in the Second Circuit's ruling in First Jersey, 101 F.3d at 1472-73, already described above. See discussion supra Part V.B.2.b.
Applying the relevant standards here, the Court finds that the Noteholders' allegation of an underlying primary violation by the Inside Directors has been met. In attempting to adequately allege "control," the Noteholders plead that "[b]ecause of [the Outside Directors'] positions," as directors of a publicly owned company, and "because of [their] position[s] of control and authority as [directors] and Audit Committee member of Livent," the Outside Directors were control persons within the meaning of § 20(a). NH SAC ¶¶ 311-17. Additionally, each is alleged to have control person status as signatories to the Registration Statement. Goldfarb in particular is alleged to be a control person by virtue of being a signatory to Livent's 1997 Annual Statement.
Officer or director status alone does not constitute control for the purposes of § 20(a) liability. See, e.g., Rubinstein v. Skyteller, Inc., 48 F.Supp.2d 315, 323 (S.D.N.Y.1999) (allegation that defendant is Treasurer and/or Chief Financial Officer of company insufficient to establish control); Sloane Overseas Fund, Ltd. v. Sapiens Int'l Corp., 941 F.Supp. 1369, 1378 (S.D.N.Y.1996); Hemming v. Alfin Fragrances, Inc., 690 F.Supp. 239, 245 *437 (S.D.N.Y.1988). Nor does membership on an audit committee by itself. See, e.g., Jacobs, 1999 WL 101772, at *18.
Courts in this District have disagreed on whether an allegation that an audit committee member signed a fraudulent SEC filing could raise a sufficient inference of control. See Jacobs, 1999 WL 101772, at *17 (citing cases). Jacobs held that "[i]t does comport with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report." Id. This Court agrees. An outside director and audit committee member who is in a position to approve a corporation's financial statements can be presumed to have "the power to direct or cause the direction of the management and policies of" the corporation, at least insofar as the "management and policies" referred to relate to ensuring a measure of accuracy in the contents of company reports and SEC registrations that they actually sign. 17 C.F.R. § 240.12b-2. For, by placing liability on directors and other controlling persons the statute contemplates not only giving plaintiffs an additional source of redress to recover losses caused by corporate misrepresentations. It also seeks indirectly to foster accountability by imposing a penalty on those who are in a position to monitor the truthfulness of corporate public representations and establish standards to that end, but fail to do so, to the detriment of the corporation's investors.
With regard to the Outside Directors' roles as culpable participants in the underlying fraud perpetrated by the Inside Directors, the pleadings fail. As the Court found above with respect to the § 10(b) claims, the Noteholders have failed to allege more than negligence on the part of the outside directors.

B. THE RIEGER ACTION

Defendants who have moved to dismiss the Rieger complaint in the Rieger Action point out, in not so subtle terms, that the Rieger Noteholders are not truly victims of fraud, but instead comprise investors variously described as very sophisticated, institutional "vulture funds" which specialize in trading in "distressed securities" and bankrupt companies, to this end purchasing "troubled debt", "speculative investments", and "non-performing assets" at prices far below face value  in this instance actually garnering discounts ranging from 43 to 55 percent of the original market price of the Notes at issue. See Joint Memorandum of Law in Support of the Old Director Defendants' Motion to Dismiss the RC at 1. In particular, defendants stress that the Rieger Noteholders acquired Livent Notes long after the Livent's public release of August 10, 1998 revealing that the company's accounts reflected major irregularities, and indeed that in Tri Link's case the Notes purchase occurred several months after the company's bankruptcy petition was filed. Thus, defendants intimate that the Rieger Noteholders' claims, arising in the wake of Livent's depredation and demise, amount to nothing more than a kind of vulturism.
Name-calling and pinning ad hominem labels on this matter should not distract us from what is at stake. For, alas, in the world of living things vultures in various guises and forms are a reality of life and death. As members of God's creatures, and as incident of the right to live, they, too, must eat in order to survive.
Translating defendants' metaphor into legal principles applicable here, the issue before the Court is not the market taxonomy of these litigants. Nor is it their institutional classification or genetic predilections as a means of profiting from loss. *438 Rather, what matters is whether and to what extent, as regards the events here in contention, the Rieger Noteholders, whatever their methods of existence and survival, were deprived of any rights by defendants that give rise to cognizable claims meriting the protection of the law. In other words, even if indeed these claimants do consist of vulture funds, the real question is whether what remains of Livent interests to which they lay claim constitutes carcass or carrion rightfully theirs to consume, or, rather, some other still living form of life more properly belonging to others. Viewing the matter so framed, the Court is not persuaded that as regards the bulk of their allegations, the Rieger Noteholders, in their second attempt, have stated claims entitling them to relief.

1. Status of Plaintiff Rieger

As a threshold matter, the status of plaintiff Alice Rieger's claims must be resolved. Rieger purchased her Notes in July 1998 and therefore falls squarely within the Noteholders' Class as defined by Judge Sweet in the Noteholders' Action. The Old Directors have moved to dismiss Rieger's claims from the Rieger Action and to consolidate them with the Noteholders' Action as per Judge Sweet's June 1999 Order. The Rieger Noteholders have moved to be appointed as lead counsel in the Rieger Action.
Rieger argues that the Old Directors do not have standing to be heard on the issue of lead plaintiff in either the Noteholders Action or the Rieger Action because, as the "majority of courts agree ... `only potential plaintiffs may be heard regarding appointment of Lead Plaintiff.'" Consolidated Response to Defendants' Motions to Dismiss at 75 (quoting Gluck v. CellStar Corp., 976 F.Supp. 542, 550 (N.D.Tex.1997)). Judge Sweet, however, noting a split among district courts, expressly held in his earlier ruling that defendants are entitled to be heard on the lead plaintiff issue. See In re Livent, Inc. Noteholders Sec. Litig. (King v. Livent), 36 F.Supp.2d 187, 191 (S.D.N.Y.1999)("On balance, a therapeutic [lead plaintiff] appointment process such as is envisaged by the PSLRA will work better with more information than less... The better view ... permit[s] the defendant to be heard."). This Court concurs with Judge Sweet's well-reasoned opinion.
Rieger also argues that consolidation is inappropriate because Judge Sweet's June 1999 Order does not apply until the Clerk of the Court serves it upon defendants. Indeed, Judge Sweet's procedures were overlooked by the Clerk, but Rieger has not been prejudiced. Assuming Rieger was unaware of the Order when she filed her complaint, a copy was served on her by the Old Directors along with their motion to consolidate her claims. Rieger has now had a full opportunity to brief the issue in her opposition papers. Accordingly, her claims brought under case number 99 Civ. 9425 will be consolidated under the Noteholders' Action in a manner to be stipulated by the parties and approved by the Court.

2. Motion to Dismiss: § 10(b) Claims

a. Reliance

Generally, reasonable reliance must be pleaded and proved as an element of a § 10(b) securities fraud claim. See Harsco Corp. v. Segui, 91 F.3d 337, 342 (2d Cir.1996); see also Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir. 1994)(Rule 10b-5 "makes unlawful any misrepresentation that would cause reasonable investors to rely thereon")(internal quotation marks omitted); Paracor Finance, Inc. v. Gen. Elec. Capital Corp., 79 F.3d 878, 886 (9th Cir.1996)("Justifiable reliance is a limitation on a Rule 10b-5 *439 action which insures that there is a causal connection between the misrepresentation and the plaintiff's harm.")(internal quotation marks omitted); Harrison v. Dean Witter Reynolds, Inc., 79 F.3d 609, 618 (7th Cir.1996)("The fact of reliance ... is not enough by itself; that reliance must be justifiable, or reasonable."); One-O-One Enter., Inc. v. Caruso, 848 F.2d 1283, 1286 (D.C.Cir.1988)("plaintiffs' allegations must indicate that their reliance on the allegedly fraudulent representations was reasonable")(citing Kennedy v. Josephthal & Co., 814 F.2d 798, 804 (1st Cir.1987)).
To determine whether a plaintiff's reliance on an alleged misstatement was reasonable, a court may, on a motion to dismiss, examine the text of the documents at issue, including any cautionary language. See Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5-9 (2d Cir. 1996); I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., 936 F.2d 759, 761-63 (2d Cir.1991); Hinerfeld v. United Auto Group, 97 Civ. 3533, 1998 WL 397852, at *4 (S.D.N.Y. July 15, 1998); Schoenhaut v. American Sensors, Inc., 986 F.Supp. 785, 792-93 (S.D.N.Y.1997). "[T]he `central issue ... is not whether the particular statements taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misl[ed] a reasonable investor about the nature of the [securities].'" Olkey, 98 F.3d at 5 (citing McMahan & Co. v. Wherehouse Entertainment, Inc., 900 F.2d 576, 579 (2d Cir.1990))(modifications in original). "[I]f plaintiff `has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations.'" Mallis v. Bankers Trust Co., 615 F.2d 68, 80-81 (2d Cir.1980) (quoting Schumaker v. Mather, 133 N.Y. 590, 596, 30 N.E. 755 (1892)) (applying New York law).
It follows that if basic inquiries would have revealed the truth, the Rieger Noteholders could not have reasonably relied on defendants' alleged misrepresentations by which they claim to have been misled. See Pail v. Precise Imports Corp., No. 99 Civ. 1624, 1999 WL 681384 (S.D.N.Y. Aug. 31, 1999); Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co., 785 F.Supp. 411, 419 (S.D.N.Y.1992)(information was available in newspapers). Courts impose a more stringent standard on sophisticated investors, holding that they have an enhanced duty to obtain available information material to investment decisions. See Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1541 (2d Cir.1997); Schlaifer Nance & Co. v. Estate of Andy Warhol, 119 F.3d 91, 98 (2d Cir.1997). Similarly, when the plaintiff "`was placed on guard or practically faced with the facts'" when entering a transaction, courts require a "heightened degree of diligence." Banque Franco-Hellenique de Commerce v. Christophides, 106 F.3d 22, 27 (2d Cir. 1997) (quoting Mallis, 615 F.2d at 81).
Tri-Links did not purchase any Livent Notes until December 8, 1998  several weeks after Livent declared bankruptcy. By the time Tri-Links purchased its Notes, according to the allegations in the Rieger Action complaint itself, Livent had announced that "investigations of Livent had revealed `massive, systematic accounting irregularities that permeated the Company.'" RC ¶ 174. Additionally, by the time Tri-Links invested in Livent, D & T "had withdrawn its audit opinions of the 1995, 1996, and 1997 financial statements and had issued new audit opinions on the restated 1996 and 1997 financial results." RC ¶ 174. Cassandra herself could not *440 have warned Tri-Links more directly and ominously that Livent's prior statements about the company's financial health could no longer be reasonably relied upon.
Cerberus, too, has alleged reliance on the misstatements made by the various groups of defendants. All of Cerberus's purchases occurred after August 10, 1998, when Livent announced publicly in the Press Release issued that day that there were (1) "serious irregularities in the Company's financial records," (2) "the irregularities involve improper recognition of revenue and the failure to record, or the improper deferral and capitalization of expenses," (3) while a full investigation has yet to be conducted, the irregularities "appear to involve millions of dollars," and (4) "it seems virtually certain that the company's financial results for 1996, 1997 and for the first quarter of 1998 will need to be restated." In light of these disclosures, this Court concludes that beginning on August 10, 1998, it was no longer reasonable for a sophisticated investor to rely on the accuracy of previous statements relating to Livent's financial condition.
Reliance on the August 1998 Press Releases themselves is no more availing. Cerberus and Tri-Links allege that those press releases contained false and misleading statements and form the basis for the Cerberus/Tri-Links fraud claims because the announcements reported "that the accounting irregularities were not expected to have a significant effect on [Livent's] current cash flow" and "contained assurances from Livent's CEO that `Livent remains a viable company financially, and is operationally and creatively strong.'" RC ¶ 165. These allegations do not overcome the releases' clear message that Livent's prior financial statements could no longer be relied upon.
The Rieger Noteholders must allege that they "reasonably relied" on a false misstatement based on "the total mix of information available to the market at the time the investment was made." In re Crystallex Int'l Corp. Sec. Class Action Litig., No. 98 Civ. 4810, 1999 WL 787655 (S.D.N.Y. Oct.4, 1999). Livent's August 1998 public disclosures that its previous financial statements were materially inaccurate precludes Cerberus and Tri-links from establishing the reasonable reliance necessary to state a § 10(b) claim based on Livent's August 1998 Press Releases.

b. Forward Looking Statements and Safe Harbor Analysis

The Rieger Noteholders' also fail to state a § 10(b) claim based on the August 1998 Press Releases because they contain forward-looking statements accompanied by meaningful cautionary language, and because the Rieger Noteholders do not allege facts that, if true, would demonstrate that the Old Director defendants actually knew the statements were false. The Rieger Noteholders do not dispute that the August 1998 Press Releases contained meaningful cautionary language. Instead, the Rieger Noteholders argue that the August 1998 Press Release statements are not forward looking and that some defendants knew of material information but chose to conceal it.
The statements that the Rieger Noteholders characterize as "statements of existing fact", Rieger Noteholders Consolidated Response to Motion to Dismiss at 19  that "Livent remains a viable company financially and is operationally and creatively very strong," and "[t]he company now has greater potential than ever before"  are statements "about the state of a company whose truth or falsity [are] discernible only after [they are] made [and] necessarily refer[] only to future performance." Harris v. Ivax Corp., 182 F.3d 799, 805 (11th Cir.1999)(statements *441 that "fundamental business and its underlying strategies remain intact" and "IVAK is certainly well positioned" are forward looking); see also Fellman v. Electro Optical Sys. Corp., No. 98 Civ. 6403, 2000 WL 489713, *4 (S.D.N.Y. Apr.25, 2000)(statements that company "is poised to become," "has the inside track," and that its "revenue and earnings potential is clearly huge" are forward looking). The Rieger Noteholders do not particularize any facts to support a strong inference that the defendants knew any statements of Livent's forward looking to be false.

3. Motion to Dismiss: Claims Under Sections 11 and 12(a)(2)

The Rieger Noteholders' §§ 11 and 12(a)(2) claims are based on misstatements or omissions contained in, or made in connection with, Livent's November 17, 1997 Registration Statement and December 18, 1997 prospectus. The Rieger Noteholders may not recover under §§ 11 or 12(a)(2) if they knew of the alleged untruth or omission at the time of purchase. See 15 U.S.C. § 77k(a) (precluding recovery where "it is proved that at the time of such acquisition [the purchaser] knew of such untruth or omission"); 15 U.S.C. § 77l(a)(2) (permitting recovery where "the purchaser [did] not know[ ] of such untruth or omission"); see also Mayer v. Oil Field Sys. Corp., 803 F.2d 749, 755 (2d Cir.1986). Knowledge that a misstatement or omission exists is sufficient to defeat a § 11 or 12(a)(2) claim; defendants need not demonstrate plaintiffs' actual knowledge of the truth. See Haralson v. E.F. Hutton Group, Inc., 919 F.2d 1014, 1032 (5th Cir.1990).
The Rieger Action Amended Complaint alleges that the Rieger Noteholders were aware prior to purchasing the Notes that Livent's registration statement and prospectus contained material misstatements. The Amended Complaint specifically alleges that the Rieger Noteholders relied on Livent's "publicly issued statements," RC ¶ 434, including the August 10, 1998 Press Release and its disclosure of "serious irregularities in the Company's financial records" and the need to restate its financial results. Tri-Links' pre-purchase knowledge was even greater than that of Cerberus because Tri-Links purchased after Livent restated its financials and filed for bankruptcy. Although the Amended Complaint alleges that Cerberus and Tri-links "did not know, or in the exercise of reasonable diligence could not have known, of the misstatements and omissions of material fact contained in the [Registration Statement and Prospectus]", id. ¶¶ 395, 420, this allegation is belied by the express assertion that both Tri-Links and Cerberus relied on the August 1998 Press Releases which disclosed that Livent's financials had been materially misstated. These contradictions, rendering necessary elements of the Rieger Noteholders' fraud claims internally self-contradictory, similarly constitute deficiencies warranting dismissal of the §§ 11 and 12(a)(2) claims. See Trans World Airlines, 449 F.2d at 63; Rapoport, 88 F.Supp.2d at 184; see also discussion supra Part V.A.
Accordingly, the Rieger Noteholders' §§ 11 and 12(a)(2) claims are dismissed with prejudice.

4. Motion to Dismiss: Claims, Under Sections 15 and 20(a)

The Court has already described, in connection with the Noteholders' § 20(a) claims, the elements necessary to make out a prima facie case under § 20(a) of the 1934 Act. See discussion supra Part V.B.2.b. The same test applies to claims brought pursuant to § 15 of the 1933 Act. Ellison v. American Image Motor Co., Inc., 36 F.Supp.2d 628, 637-38 (S.D.N.Y. *442 1999) (applying the same test to 1933 Act § 15 claims and 1934 Act § 20(a) claims).
Since, as noted above, the Rieger Noteholders have failed to adequately plead primary violations under either § 10(b) or §§ 11 and 12(a)(2), their §§ 15 and 20(a) control person claims must also be dismissed.

a. State Claims and the Securities Litigation Uniform Standards Act

Deloitte, PaineWebber, Furman Selz, and CIBC argue that all of the Rieger Noteholders' state law claims are barred by the Securities Litigation Uniform Standards Act (the "Standards Act") of 1998, Pub.L. 105-353, 112 Stat. 3227 (1998); 15 U.S.C. § 78bb(f). The Standards Act permits the removal of state court securities class actions to federal court and abolishes state law causes of action in securities fraud cases involving securities covered by the federal statutes. The central question before this Court is whether Congress, in enacting the Standards Act, intended to preempt state law claims such as those presently brought by the Rieger Noteholders.
As noted above, see discussion supra Part V.B.3.b., the PSLRA sought to constrain plaintiffs' ability to bring securities class actions by, among other things, establishing heightened pleading requirements, staying discovery pending resolution of motions to dismiss, and imposing limits on recovery. 15 U.S.C. § 78u-4(b)(1), 78u-4(b)(3), 78u-4(e). To avoid these constraints, plaintiffs increasingly began filing securities actions in state court.[12]
Congress enacted the Standards Act in 1998 in order to prevent class action plaintiffs from bypassing the PSLRA by filing similar cases in state court. Towards that end, the Standards Act provides that:
No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging  (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.
15 U.S.C. §§ 78bb(f)(1). A "covered class action" includes any lawsuit in which "one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any question affecting only individual persons or members." 15 U.S.C. §§ 77p(f)(2)(A)(i)(II), 78bb(f)(5)(B)(i)(II). A covered security includes the debt of a company with securities listed on the National Market System of the NASDAQ stock market. See 15 U.S.C. § 77r(b)(1)(A).
In their opposition brief, rather than defend, the Rieger Noteholders concede the dismissal of their claims for common law fraud, negligence, and negligent misrepresentation, stating that they will "replead their claims ... and/or will bring such claims in state court outside the context of this class action." Plaintiff's Memorandum in Opposition to Motion to Dismiss at 70 n. 35. But the Rieger Noteholders' claims for fraud, negligence, and negligent misrepresentation are all *443 grounded on alleged misstatements in Livent's Registration Statement, Prospectus, or August 1998 Press Releases made in connection with the sale of the Notes. Those claims are clearly barred by the Standards Act and accordingly are dismissed with prejudice insofar as they are asserted in the form of a class action.
The Rieger Noteholders' remaining state law claim is for tortious interference with contract. The elements of a claim for tortious interference with contract claim are well established: the existence of a valid contract; the tortfeasor's knowledge of the contract and intentional interference with it; the resulting breach; and damages. See Loftus, Inc. v. White, 150 A.D.2d 857, 540 N.Y.S.2d 610 (N.Y.App. Div.3d Dep't 1989). The Rieger Noteholders allege that defendants interfered with the change-of-control clause in the Trust Indenture between Livent and Wilmington Trust Company. That provision requires Livent to offer to repurchase the Notes for 101 percent of the principal amount, plus accrued and unpaid interest, when "neither [Drabinsky] nor [Gottlieb] shall be employed in an executive capacity at and involved in the strategic planning of [Livent]." Rosenberg Aff. Ex. Q § 1.1, at 6 and § 4.15. The Rieger Noteholders allege that to avoid that clause, "all the defendants" schemed to demote and suspend Drabinsky and Gottlieb rather than discharge them and thereby "subvert ... the bondholders' contractual right to demand payment in full." RC ¶ 447.
The Court is of the view that the tortious interference with contract claim is barred by the Standards Act for the same reasons and to the same extent as the Rieger Noteholders' other state claims. The issue is whether personnel decisions by the defendants that were intended to avoid Livent's obligation to repurchase the Notes constituted a "manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1)(B). Plainly, the Rieger Noteholders contend that defendants employed a manipulative or deceptive device or contrivance  in that they allegedly demoted and suspended rather than fired Drabinsky and Gottlieb. The claimed ulterior purpose of this scheme was to evade Livent's contractual obligation under the change-of-control clause to repurchase the Notes.
The Exchange Act defines the terms "purchase" and "sale" to include any "contract to buy, purchase, or otherwise acquire." 15 U.S.C. § 78c(a)(13) & (14). Consequently, § 10(b) prohibits fraud in connection with the purchase of, or in connection with a contract to purchase, a covered security. Interpreting this provision, the Second Circuit held in Yoder v. Orthomolecular Nutrition Institute, Inc., 751 F.2d 555, 558-59 (2d Cir.1985) (Friendly, J.), that a contract that called for the issuance to the plaintiff, in certain circumstances, of stock in the defendant corporation involved a purchase and sale of securities even though the securities were never issued. See also Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 750-51, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Applying the language of the statute and the Yoder court's reasoning here, this Court concludes that the Rieger Noteholders' claim that defendants committed fraud in connection with a contract to re-purchase the Notes is barred by the Standards Act. Accordingly, the Rieger Noteholders' tortious interference with contract claim is dismissed with prejudice.

b. Motion to Strike the Answer of Drabinsky, Eckstein, and Gottlieb and for Judgment on the Pleadings

The Rieger Noteholders have moved to strike the answers of Drabinsky and Eckstein *444 and for judgment on the pleadings based on their blanket invocation of the privilege against self-incrimination under the Fifth Amendment to the United States Constitution and Article I of the New York State constitution. Eckstein has not responded to this motion. Drabinsky argues that a blanket assertion of the privilege is warranted where, as here, the pending criminal charges against the defendant are predicated on the same factual allegations asserted in the complaint.
The Fifth Amendment provides that "no person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. It is well-established that the privilege against self-incrimination applies not only to criminal proceedings, but to civil proceedings as well where statements may later be used in a criminal proceeding against the speaker. See Minnesota v. Murphy, 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (privilege against self-incrimination "not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."); McCarthy v. Arndstein, 266 U.S. 34, 40, 45 S.Ct. 16, 69 L.Ed. 158, (1924) (The privilege "applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it."). But Drabinsky's and Eckstein's blanket assertions of the privilege against the entire complaint  including, for example, assertions of jurisdiction, venue, and the defendants' positions with Livent  are overly broad and unnecessary.
A court must, however, be wary that inappropriate procedural remedies or unwarranted sanctions do not unduly burden a litigant's valid attempts to seek the protection that the privilege against self-incrimination provides, especially when there is nothing to suggest that the Fifth Amendment was used abusively or to gain an unfair tactical advantage. See United States v. 4003-4005 5th Ave., 55 F.3d 78, 85 (2d Cir.1995); SEC v. Graystone Nash, 25 F.3d 187, 192 (3d Cir.1994) ("Because the privilege is constitutionally based, the detriment to the party asserting it should be no more than is necessary to prevent unfair and unnecessary prejudice to the other side."). Plainly, both Drabinsky and Gottlieb have good reason to seek the protections of the Fifth Amendment, as a criminal investigation based on the very conduct alleged here is currently pending in this District. Accordingly, the Rieger Noteholders' request for judgment on the pleadings against Drabinsky, Gottlieb and Eckstein is denied.
It would not unduly burden defendants to parse through the complaint, however, as Drabinsky has suggested this Court do, to determine the validity and necessity of defendants' asserting the Fifth Amendment privilege with respect to each individual allegation. The motion to strike the answer is therefore granted. Defendants Drabinsky, Gottlieb, and Eckstein are directed to file amended answers to the Rieger Action's First Amended Complaint within twenty (20) days of the date of this Decision and Order.
Finally, Cerberus's and Tri-Links's pursuit of claims on behalf of Noteholders who acquired their Notes during the Noteholders Class Period  that is, from October 10, 1997 through August 10, 1998, inclusive  is in direct contravention of Judge Sweet's June 19, 1998 Order, which provides that "no pleadings or other papers shall be filed or discovery conducted by any plaintiff ... except as directed or undertaken by Co-Lead Counsel." Accordingly, Cerberus *445 and Tri-Links are enjoined from pursuing claims on behalf of Noteholders who acquired their Notes during the Class Period.

VII. ORDER
For the reasons set forth above, it is hereby

A. THE NOTEHOLDERS' ACTION, 98 Civ. 7161

ORDERED that the motion of defendants CIBC Oppenheimer and CIBC Wood Gundy to dismiss [Doc. 52-1] is GRANTED with respect to the Noteholders' claims under §§ 10(b) and § 11, but the Noteholder Plaintiffs are granted leave to replead under § 10(b), and the motion is GRANTED with respect to Noteholders' claims under § 12(a)(2); and it is further
ORDERED that the motion of defendant Deloitte & Touche, Chartered Accounts to dismiss [Doc. 55-1] is GRANTED in part and DENIED in part with respect to Noteholders' claims under § 10(b) and denied with respect to Noteholders' claims under § 11; and it is further
ORDERED that the motion of defendants PaineWebber and Furman Selz to dismiss [Doc. 58-1] is GRANTED; and it is further
ORDERED that the motion of defendants Emerson, Goldfarb, Taubman, Lee, Pattison, Sperling, and Rotman to dismiss [Doc. 60-1], and the motion of defendant Brambilla to dismiss [Doc. 64-1] are GRANTED with respect to Noteholders' claims under §§ 10(b), 12(a)(2), 15 and 20(a) and DENIED with respect to Noteholders' claims under § 11. The Noteholders may seek leave to replead claims under § 10(b) within twenty (20) days of the date of this Decision and Order, but leave shall be granted only upon a convincing demonstration that there are factual allegations which have not been tested in either this action or any related actions before this Court based on the same core facts and transactions, and which if true would suffice to state a claim upon which relief may be granted; and it is further

B. THE RIEGER ACTION, 99 Civ. 9425

ORDERED that the motion of defendants PaineWebber and Furman Selz to dismiss [Doc. 25-1] is GRANTED; and it is further
ORDERED that the motion of defendant Deloitte & Touche Chartered, Accountants to dismiss [Doc. 27-1] is GRANTED;
ORDERED that the motion of defendant Deloitte & Touche, LLP to dismiss [Doc. 32-1] is GRANTED; and it is further
ORDERED that the motion of defendant Estate of Andrew Sarlos to dismiss [Doc. 35-1] is TERMINATED pursuant to a stipulation [Doc. 65] by the parties dated June 20, 2000; and it is further
ORDERED that the motion of defendants Goldfarb, Emerson, Taubman, Black, Lee, Pattison, Rotman, and Sperling to dismiss [Doc. 37-1] is GRANTED; and it is further
ORDERED that the motion of defendant Furman to dismiss [Doc. 39-1] is GRANTED; and it is further
ORDERED that the emotion of defendants Lynx Ventures, L.P., Lynx Ventures, LLC, Ovitz, Burkle, Cross, Jones, Munroe-Blum and Speyer to dismiss [Doc. 43-1] is GRANTED; and it is further
ORDERED that the Rieger Noteholders' motions to strike the answers of defendants Drabinsky, Eckstein, and Gottlieb [Docs. 48-1, 48-2] are GRANTED and *446 for judgment on the pleadings [Docs. 69-1, 69-2] are DENIED; and it is further
ORDERED that the Rieger Noteholders' motion for an order appointing them as Lead Plaintiffs and approving their selection of counsel as Lead Counsel [Docs. 57-1, 57-2] is DENIED; and it is further
ORDERED that the motion of defendant Topol to dismiss [Doc. 59-1] is GRANTED; and it is further
ORDERED that the motion of defendant Cerberus Capital to be appointed as Lead Plaintiffs [Doc. 68-1] and for an order approving Lead Counsel [Doc. 68-2] is DENIED; and it is further
ORDERED that plaintiffs Cerberus Capital and Tri-Links answer defendant CIBC Oppenheimer's motion to dismiss [Doc. 91-1] within twenty (20) days of the date of this Decision and Order; and it is further
ORDERED that defendants Drabinsky, Gottlieb, and Eckstein are directed to file an amended answers to the Rieger Action's First Amended Complaint within twenty (20) days of the date of this Decision and Order; and it is further
ORDERED that the motion of defendant Outside Directors' motion to dismiss Plaintiff Alice Rieger's claims and to consolidate them with the Noteholders' Action is GRANTED, with consolidation to be accomplished in a manner to be stipulated by the parties within twenty (20) days of the date of this Decision and Order, and it is further
ORDERED that plaintiffs Cerberus Capital and Tri-Links are enjoined from pursuing claims on behalf of members of the Noteholders Class as defined in the Noteholders' Action, 98 Civ. 7161.
SO ORDERED.
NOTES
[1] There are two other related class actions pending before this Court, both brought on behalf of Livent shareholders: In re Livent Sec. Litig., No. 98 Civ. 5686 (the "Shareholders' Action"), and Griffin v. PaineWebber, No. 99 Civ. 2292 (the "Griffin Action").
[2] "Relativism means the introduction of a richer language which allows us to meet adequately the requirements of the enriched experience. We are now able to cover these new facts by plain and direct words and to come one step nearer to what one may call the `plain truth about the universe'." Ronald W. Clark, Einstein, The Life and Times (Avon Books 1971) at 136 (quoting Philipp Frank).
[3] The identities and subgroups of the defendants are taken, as pertinent, from ¶¶ 15-38 of the NH SAC and ¶¶ 11-89 of the RC.
[4] See Compl. ¶ 35, Harris v. Livent, No. 98 Civ. 5726 (S.D.N.Y. Aug. 11, 1998); Compl. ¶¶ 27-59, Rosen v. Livent, No. 98 Civ. 5686 (S.D.N.Y. Aug. 11, 1998); Compl. ¶¶ 22-41, 47, Klimek v. Livent, No. 98 Civ. 5742 (S.D.N.Y. Aug. 11, 1998); Compl. ¶ 54, Carrano v. Livent, No. 98 Civ. 5731 (S.D.N.Y. Aug. 11, 1998); Compl. ¶¶ 23-40, Stone v. Livent, No. 98 Civ. 5736, (S.D.N.Y. Aug. 12, 1998); Compl. ¶¶ 28-44, Krasner v. Drabinsky, No. 98 Civ. 5755 (S.D.N.Y. Aug. 12, 1998); Compl. ¶ 36, Parsons v. Livent, No. 98 Civ. 5842 (S.D.N.Y. Aug. 13, 1998); Compl. ¶ 53, Rubin v. Livent, No. 98 Civ. 5907 (S.D.N.Y. Aug. 18, 1998); Compl. ¶ 56, Ruth Salit Trust v. Livent, No. 98 Civ. 5884 (S.D.N.Y. Aug. 18, 1998); Compl. ¶¶ 39-48. 53-56, 60-71, 76-79, 85-88, 92-94, Pizzuti v. Livent, No. 98 Civ. 5971 (S.D.N.Y. Aug. 21, 1998); Compl. ¶¶ 5-6, 45-47, Milton v. Livent, No. 98 Civ. 6075 (S.D.N.Y. Aug. 26, 1998); Compl. ¶¶ 37-41, Stevens v. Livent, No. 98 Civ. 6077 (S.D.N.Y. Aug. 26, 1998).
[5] This definition parallels the test promulgated by the Seventh Circuit in Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1045 (7th Cir.1977), cert denied, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977), and later followed by several other Circuit Courts: "Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."
[6] The split described above is reflected among Circuits, and even within other circuits the district courts evince similar disarray and inconsistent rulings with regard to the § 20(a) pleading standard. Unfortunately, the holdings of other Circuits with respect to pleading requirements under § 20(a) do not provide additional edification which would aid this Court in the present proceedings. Compare Harrison v. Dean Witter Reynolds, Inc., 79 F.3d 609, 614 (7th Cir.1996) (rejecting the culpable participant requirement); Metge v. Baehler, 762 F.2d 621 (8th Cir.1985) (same); Maher v. Durango Metals, Inc., 144 F.3d 1302, 1305 (10th Cir.1998) (same); Brown v. Enstar Group, 84 F.3d 393, 397, n. 5 (11th Cir.1996) (same) with Rochez Brothers, Inc. v. Rhoades, 527 F.2d 880, 890 (3d Cir.1975) (requiring culpable participation); Carpenter v. Harris, Upham & Co., Inc., 594 F.2d 388, 394 (4th Cir.1979) (same). The Ninth Circuit has recently overruled itself. Compare Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1574-75 (9th Cir.1990) with Zweig v. Hearst Corp., 521 F.2d 1129, 1132 (9th Cir.1975). Courts in the Fifth Circuit are divided. Compare G.A. Thompson & Co., Inc. v. Partridge, 636 F.2d 945, 958 (5th Cir.1981) with Dennis v. General Imaging, Inc., 918 F.2d 496, 509 (5th Cir. 1990).
[7] The PSLRA Conference Committee Report noted that Congress was prompted to enact reforms by evidence of abusive practices committed in private securities litigation, including: "(1) the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action; (2) the targeting of deep pocket defendants, including accountants, underwriters, and individuals who may be covered by insurance, without regard to their actual culpability; (3) the abuse of the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle; and (4) the manipulation by class action lawyers of the clients whom they purportedly represent." H.R. Conf. Rep. No. 104-369, at 31-32 (1995).
[8] In citing Press, the Novak court parenthetically characterizes its reference to the Press discussion of the issue as "dicta". See Novak, 216 F.3d at 310.
[9] Several courts in this District have continued to adhere to the Second Circuit's pre-PSLRA standard. See, e.g., Gabriel Capital, 122 F.Supp.2d 407; Apex Arc, Inc. v. Garvey, 104 F.Supp.2d 326 (S.D.N.Y.2000); In re Twinlab Corp., 103 F.Supp.2d 193.
[10] For an early assessment of the effects of the PSLRA, see the 1997 report by the Securities Exchange Commission. Fed. Sec. L. Rep (CCH) Report Bull. 1763 (April 23, 1997). The Commission there indicates a decline in the number of securities litigation cases filed during the year immediately after the PSLRA's enactment. See also Hazen § 13.31[1]. at 122 (2000 Pocket Part) ("The Reform Act's heightened pleading standards and discovery stay provisions appear to have been successful in making it more difficult for plaintiffs to bring securities law claims.").
[11] Rule 144A(b) states: "Any person, other than the issuer or a dealer, who offers or sells securities in compliance with the conditions set forth in paragraph (d) of this section shall be deemed not to be engaged in a distribution of such securities and therefore not to be an underwriter of such securities within the meaning of sections 2(11) and 4(1) of the [1933] Act". 17 C.F.R. § 230.144A(b).
[12] In California, for example, the number of securities class action filings in state court went up five-fold in the wake of the PSLRA's passage. See H.R. Conf. Rep. 105-803, at 15 (1998).